UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:
                                                  Chapter 13

AARON FISCHMAN,
                                                  Case No. 23-35660 (CGM)

                                    Debtor.
--------------------------------------------------------x

**DECLARATION IN SUPPORT OF SHALOM MAIDENBAUM'S OPPOSITION TO (I) FISCHMAN'S MOTION TO ENFORCE THE AUTOMATIC STAY, AND (II) FISCHMAN'S APPLICATION TO CONVERT HIS CHAPTER 13 CASE TO CHAPTER 11**

I, Shai Ganor, Adv., duly affirm under the penalty of perjury and state upon personal knowledge (unless stated otherwise), as follows:

**A. Introduction**

1.  I am an attorney duly admitted to practice law in the State of Israel and a member of the Israeli Bar Association since 1992. Since 1999, I have been a Partner at E.S. Shimron, I. Molho, Persky & Co - Law Offices & Notary and I currently head the firm's Tel Aviv office.

2.  E.S. Shimron, I. Molho, Persky & Co. is one of Israel's oldest firms, dating back to the foundation of the firm in Jerusalem in 1953 only five years after the formation of the State of Israel. The firm was founded by Erwin S. Shimron, Israel's second State Attorney. The firm has been serving prominent Israeli and international private, corporate and institutional clients for over 70 years. Amongst our prominent clients, the firm represents the United States Department of State in various legal matters related to its real estate in Israel, including the matter of establishing the new US diplomatic and consular facilities in Jerusalem.

3.  Our firm has represented Mr. Shalom Maidenbaum ("**Maidenbaum**") in his efforts to enforce in Israel four foreign monetary judgments of confession in a total amount of US $3,274,540.78 granted by the competent court in New York (the "**NY Judgments**"

or "**Foreign Judgments**"), against the Debtor, Mr. Aaron Fischman ("**Fischman**") and in relevant proceedings against his wife Nina Fischman ("**Nina**"), as described below.

4.  As explained below, the enforcement actions in Israel were required due to the existence of an apartment owned by Fischman which he fraudulently registered in his wife's (Nina) name. This luxury apartment is situated in Jerusalem, and known as apartment no. 14 in building B3 in Block 30028 Parcel 139 (the "**Apartment**").

5.  I submit this declaration in opposition to (i) Fischman's Motion to Enforce the Automatic Stay, and (ii) Fischman's Application To Convert His Chapter 13 Case To Chapter 11.

6.  As part of this declaration, I will also comment on the Declaration In Support of Debtor's Motion To Enforce Automatic Stay ("**Barzel Declaration**") dated September 20, 2023 signed by Adv. Avraham Barzel ("**Adv. Barzel**"), which unfortunately and to say the least is largely inaccurate and misleading (see specifically Sections 14, 19, 36, 50 herein). I have been advised by Maidenbaum's U.S. counsel, that the Barzel Declaration was filed in this Court on September 19, 2023 with exhibits in Hebrew [ECF No. 19] and that only on October 11, 2023, after numerous requests by Maidenbaum's U.S. counsel for English translations of the exhibits, Fischman filed English translations [ECF No. 34]. I do not provide any opinion herein on the accuracy of said translations.

7.  I confirm that I am fluent in both Hebrew and English, and all following citations included in this declaration are true and correct translations from Hebrew to English.

## B. Background

Recognition and Enforcement of the NY Judgments

8.  Any judgment or order by a court outside of Israel, including judgments originating from the United States of America, is deemed by Israeli law as "*foreign*". According to Israeli law, foreign judgments are not automatically recognized and effective in the State of Israel, unless an authorized Israeli court declares the foreign judgment as

enforceable or recognized [see, the Foreign Judgments Enforcement Law. 5718-1958 (the "**Foreign Judgments Enforcement Law**")].

9.  In order to initiate any enforcement actions in connection with the NY Judgments and the Apartment, Maidenbaum first filed a motion on September 13, 2018, with the District Court of Jerusalem (the "**Jerusalem District Court**") to declare the NY Judgments as recognized under Israeli law and enforceable in Israel.

10. Concurrently with this motion, Maidenbaum filed a motion seeking a temporary attachment to be registered with respect to the Apartment to avoid further fraudulent action or dispositions intended to frustrate his collection efforts. On October 11, 2018, a temporary attachment on the Apartment was granted in favor of Maidenbaum by the Honorable Registrar Tamar Bar-Asher of the Jerusalem District Court.

11. On March 31, 2019, after personal service of all applicable court documents and their translations was made to Fischman and Nina, both in New York and in Israel, and following Fischman's failure to respond, a judgment was granted (by the Honorable Registrar Tamar Bar-Asher of the Jerusalem District Court), declaring that the Foreign Judgments are recognized and enforceable against Fischman in Israel.

<u>Declaration of Fischman's Rights in the Apartment by the Jerusalem District Court</u>

12. Following the Jerusalem District Court's recognition of the Foreign Judgments in Israel, Maidenbaum then filed an originating motion with the Jerusalem District Court, requesting, *inter alia*, a declaration that Fischman owns the rights in the Apartment, and that the temporary attachment imposed on the Apartment in Maidenbaum's favor be confirmed and registered on Fischman's rights (the "**Originating Motion**").

13. The Originating Motion was filed in accordance with Section 34B of the Enforcement Law, 1967 (the "**Enforcement Law**"), which authorizes the District Courts to declare a real estate asset which is not registered in the name of a debtor as owned by the debtor and therefore available for attachment by creditors. The Originating Motion argued that Fischman funded the acquisition of the Apartment, that he is and always was the true owner of the Apartment and that it was registered in Nina's name fraudulently.

090302\1\170404906.v4

14. Contrary to the Barzel Declaration, Maidenbaum never sought to *"declare the Israeli Home as marital property"* [see the Barzel Declaration ¶ 8]. In fact, in the final judgment, the Jerusalem District Court clarified, as follows:

> *"...the cause of action forming the basis of the action is **not** based on the Defendants being a married couple, and this is not an assertion of an assumption of joint property, but causes of action under the general law on misappropriation of assets concerned with registration for appearance's sake, fraudulent transfer, etc."* [paragraph 99].

Moreover, only ten days prior to the date of the Barzel Declaration, Adv. Barzel himself argued that the proceedings were not based on marital issues. During a hearing that took place on September 10, 2023, in the Magistrate Court of Jerusalem in Nina's appeal, as described below, Adv. Barzel declared:

> *"...in the proceeding that took place before the District Court as stated in section 69 of the judgment that it did not enter into a legal question in the matter of family law rights."*

In the Barzel Declaration, Adv. Barzel therefore made declarations that are the complete opposite of his own arguments before the courts in Israel[1].

15. Pursuant to a full evidentiary trial, in which both Fischman and Nina were represented by counsel (not Adv. Barzel) and Fischman gave extensive testimony, the Jerusalem District Court by Honorable Judge Shoshana Leibowitz in its ruling of September 2, 2022, in Civil Claim 56273-04-19 Maidenbaum v. Fischman et al (the "**Declaratory Judgment**"), granted Maidenbaum all remedies requested.

-- Certified translation of the Declaratory Judgment of September 2, 2022, is annexed as **Exhibit 1**.

---

[1] In fact, Fischman and Nina were the ones who raised claims based on marital rights, but these arguments were rejected by the Jerusalem District Court.

4

16. The Jerusalem District Court held that Fischman was the legal purchaser and owner of the Apartment (and not Nina) and that the monies used to purchase the Apartment were Fischman's (noting, that during oral summations Fischman's counsel admitted that his testimony and affidavits alleging that Nina had purchased the Apartment from her own resources, were untrue). As held by the Jerusalem District Court [paragraphs 30 – 32]:

> "30.   In the present case, the Plaintiff argued from the start of the proceeding that Defendant 1 financed the purchase of the Apartment from his own financial resources. Defendant 2 was financially unable to finance the purchase of the Apartment because personally she has no assets or independent sources of income, certainly not in the amount required to finance the down payment ("equity") required to purchase a luxury apartment, and to pay the Bank significant amounts to cover the loan she took out for this purpose.
>
> 31.   _Taking into consideration the Defendants' admission on this matter in the summations_, we could have shortened matters and a determination could have sufficed that it is no longer disputed that the Plaintiff proved that the Apartment had been purchased with Defendant 1's financial resources. However, in view of the Defendants' assertion that at least part of the financing (the "initial capital") originated from monies that had been transferred to Defendant 2 many years before the purchase of the Apartment, and also due to the significance in relation to the credibility of Defendant 1's testimony, I will explain the sequence of events.
>
> 32.   _The Plaintiff presented an increasingly "solid" basis of evidence during the proceeding to establish his argument that the Apartment was purchased from Defendant 1's financial resources._" [emphasis added]

17. The Jerusalem District Court concluded that Fischman's actions, and specifically the decision to register Nina as the owner of the Apartment, were clearly fraudulent:

090302\1\170404906.v4

> "*it is my opinion that the internal badges of fraud that were proven are sufficient to lead to a conclusion that their financial conduct established fear from potential creditors. Added to these badges are also the external badges of fraud, which together create a clear picture that we are concerned here with a fraudulent transfer.* [paragraph 98]"

18. All appeals against the judgment above, that were submitted to the Supreme Court of Israel, were eventually dismissed resulting in the judgment of the Jerusalem District Court becoming final and unappealable.

19. In light of the above, Adv. Barzel's statements in the Barzel Declaration that "*Nina Fischman duly purchased a home in the State of Israel (the "Israeli Home") in her sole name*" [paragraph 5], and that "*At all relevant times, the monies used to purchase the Israeli Home and its title were always in the exclusive possession of Nina Fischman*" [paragraph 6], are no less than blatant and highly unethical misrepresentations that are directly contrary to the factual and legal determinations of the Declaratory Judgment. Adv. Barzel took no part in the legal proceedings before the Jerusalem District Court, but did prepare and file the appeal on the Declaratory Judgment and is well aware of its content, yet nonetheless, knowingly misleads this Honorable Court by distorting the Declaratory Judgment, and declaring in direct contradiction of Fischman's own admissions in court, of which he is aware.

As mentioned above and noted by the Jerusalem District Court in Section 31 of the Declaratory Judgment, during oral summations, Fischman's counsel admitted his testimony and his affidavits[2] alleging that Nina had purchased the Apartment from her own resources were untrue.

Specifically, in an Affidavit signed on June 15, 2021 and filed with the Jerusalem District Court on July 15, 2021 Fischman declared that: "*8. At all relevant times, I am aware that my wife, Nina Fischman, paid $2,065,000 to purchase the apartment in*

---

[2] To clarify, in Israeli civil cases, direct evidence of a witness is mostly provided in advance and in writing by way of an Affidavit, which form is prescribed by law. All rules that apply to perjury apply to false statements in an Affidavit.

*Israel from her own money…. 9.At all relevant times, I did not pay for my wife's apartment in Israel. 10. At all relevant times, I did not advance any money from Cardis to finance my wife's apartment in Israel, indeed, I had no role in financing the apartment"*, wording which unfortunately Adv. Barzel chose to resonate directly in Section 6 of the Barzel Declaration.

-- Fischman's affidavit submitted to the Jerusalem District Court is annexed as **Exhibit 2**.

However, during oral summation in the same proceeding the following exchange between the Hon. Judge Leibowitz and Adv. Rubin, Fischman and Nina's counsel took place [pages 68 – 69 of the minutes]:

> *"**Honorable Judge Shoshana Leibowitz**: … look, Fischman had a lot of business, … so I'm asking you Ma'am whether the apartment, is there consent that, contrary to his affidavit, but now we understand that the apartment was financed with funds whose source, you can perhaps disagree about the sources, it is important that their source is Mr. Fischman.*
> ***Adv. Tamar Rubin**: The source was definitely from Mr. Fischman's salary.*
> *…*
> ***Adv. Tamar Rubin**: The fact that he actually brought the money is true.*
> *…*
> ***Adv. Tamar Rubin**: He transferred the funds."*

## C. Sale of the Apartment by the Receiver Appointed by the Bank

20. In the State of Israel, the enforcement of judgements is governed by the Enforcement and Collection System Authority, an independent auxiliary unit of the Ministry of Justice and part of the judicial system ("**Authority**"), under a specific legislation called the Enforcement Law. The Enforcement Law provides for judicial oversight and management, by administrative judge registrars, for the execution, enforcement and

collection of debts following judgments or other court decisions in civil matters, pledges, and mortgages.

<u>The Bank's Enforcement File</u>

21. The Bank of Jerusalem (the "**Bank**") financed the purchase of the Apartment, by providing a loan of US $1,425,000 and the debt was secured by a pledge of all rights in the Apartment which were registered with the Registrar of Pledges, coupled with a cautionary note in favor of the Bank in respect of an undertaking to register a mortgage, registered in the Land Registry.

22. In 2016, due to failures of Fischman and Nina to meet current payments, the Bank initiated a foreclosure case in the Israel Execution Office in Jerusalem against Nina, who was then still the registered owner, however after the arrears were paid up at the time, the case was dismissed by the Bank. Later, in 2018, after current payments of the mortgage were again behind, a second foreclosure case was opened against Nina by the Bank in Enforcement File 529055-03-18 (the "**Bank's Enforcement File**").

23. Within the scope of the Bank's Enforcement File, following a motion on behalf of the Bank the presiding administrative judge registrar ("**Registrar**") granted on March 19. 2019, the Bank's motion to appoint Adv. Emmanuel Zentler as the receiver on behalf of the Bank who shall execute the foreclosure of the Apartment (the "**Receiver**").

-- Translation of the relevant page from the Registrar's Appointment of the Receiver on behalf of the Bank is annexed as **Exhibit 3**.

24. In accordance with the September 2, 2022, Declaratory Judgment, the Bank filed a motion with the Execution Office to replace Nina by Fischman as the owner of the Apartment.

25. It should be noted that from time to time, since 2018, both before and after the Declaratory Judgment, Fischman would pay on the eve of foreclosure proceedings the then outstanding arrears to the Bank. Following such payments, the Bank agreed from time to time to postpone the foreclosure of the Apartment. However, after repetition of

this pattern the Bank decided to follow through with the foreclosure, regardless of any occasional payments.

<u>Maidenbaum's Enforcement Proceeding</u>

26. During December 2022, following the Declaratory Judgment Maidenbaum opened a separate Enforcement file in Israel to enforce the NY Judgments that had been recognized in Israel in his favor – Enforcement File 518975-10-22 ("**Maidenbaum's Enforcement Proceeding**").

27. Within the scope of Maidenbaum's Enforcement Proceeding, on January 19, 2023, Maidenbaum filed a motion to appoint his own receiver that will carry out the foreclosure of the Apartment and its sale. However, in the context of a report filed by the Receiver in the Bank's Enforcement File, the Receiver stated:

> *"On January 24, 2023, the undersigned received the decision in file number 518975-10-22 in light of the Creditor's motion in the said file to appoint a receiver on the rights of the Debtor in the property.*
>
> *In this regard, it should be clarified that the Creditor [the Bank - S.G.] has a security interest on the rights of the Debtor in the property and does not agree that any other creditor whatsoever will realize the property which is pledged in its favor because of the debt to such other creditor."*

The Bank further clarified its intent to proceed with the foreclosure. On February 6, 2023 the Registrar ordered that the Receiver appointed by the Bank will continue with the foreclosure of the Apartment subject to the Receiver's fiduciary obligation under the law, towards all creditors.

-- Translation of the decision of the Registrar dated February 6, 2023, is annexed as **Exhibit 4**.

090302\1\170404906.v4

28. In March 2023, following the Registrar's approval, the Receiver proceeded with the foreclosure of the Apartment in the Bank's Enforcement File and took physical and legal possession of the Apartment.

29. However, the Receiver was met with several attempts to delay the foreclosure efforts, by various actions taken by Fischman and Nina, in both cases though Adv. Barzel. Among other tactics, Fischman and Nina submitted countless motions to delay, several appeals against the Registrar's decisions, and a number of different motions for injunctions in various judicial instances.

30. In April 2023, in the framework of an appeal to the Israeli Supreme Court directed against the Declaratory Judgment, Fischman managed to get an *ex-parte* temporary injunction from Supreme Court Judge Stein, delaying any dispositions in the Apartment. However, on June 1, 2023, the appeal was dismissed resulting in the dismissal of the said injunction order. Thereafter, on June 15, 2023, the Receiver notified the Enforcement Office of the dismissal of the injunction and the Receiver's intention to recommence the proceedings to sell the Apartment.

-- Translation of the Receiver's notification of renewal of foreclosure dated June 15, 2023, is annexed as **Exhibit 5**.

31. On June 30, 2023, in the scope of the Bank's Enforcement File's and as part of the foreclosure efforts on behalf of the Bank, the Receiver published in the local newspaper an invitation for offers to purchase the Apartment. On July 18, 2023, as part of the bidding process, Maidenbaum submitted to the Receiver an offer for the purchase of the Apartment.

32. An auction between offerors (one of which was Maidenbaum himself) was scheduled to take place on August 1, 2023. According to Israeli law and practice the debtor is allowed to be present at the auction. Accordingly, the Receiver coordinated the date and time in advance with Fischman through his attorney, Adv. Barzel. However, moments prior to the start of the auction, Adv. Barzel requested to postpone the auction because of a filing he made on behalf of Nina purportedly against Fischman, with the Rabbinical

Court of Jerusalem, requesting the couple's supposed divorce and an injunction regarding the sale of the Apartment. Adv. Barzel failed to procure an order delaying the auction or the sale of the Apartment, and thus the Receiver denied the request and carried on with the auction. After the auction had taken place, Mr. Daniel Beer, with an offer of ILS 14.5M (approximately US $3.8M), was declared by the Receiver as the winning bidder.

33. After the winning bid was declared, on August 2, 2023, the Receiver filed a motion to approve the sale of the Apartment by the Registrar. On August 6, 2023, the Registrar gave Fischman 7 days to respond to the Bank's motion. Notably he never did respond.

34. Instead, on August 3, 2023, Adv. Barzel filed yet another motion on behalf of Nina in the Bank's Enforcement Proceeding to stop the sale, based primarily on the above-mentioned rabbinical proceedings (this document was attached in Hebrew as Exhibit A to the Barzel Declaration). As part of this motion, Adv. Barzel mentioned, for the first time, Choshen Israel Group LLC's ("**Choshen Israel**") insolvency proceedings filed in the U.S. Bankruptcy Court. On August 6, the Registrar resolved that the Receiver and the Bank may respond within 14 days. Notably, I have been informed by Maidenbaum's U.S. counsel, that on August 10, Fischman filed a Chapter 13 case in the U.S. Bankruptcy Court; I address this matter further below, however would note now, that neither Fischman nor Adv. Barzel notified the Israeli Courts of that bankruptcy case, and it was first mentioned in passing only by Adv. Barzel acting as Nina's attorney on September 10, 2023, as explained further below. In fact, Fischman never argued in Israel that there was or should be any stay as a result of his bankruptcy case.

35. On August 13, as an interested party, Maidenbaum filed an unsolicited response addressing the bogus Rabbinical Proceedings that had been commenced by Nina (this document was attached in Hebrew as Exhibit B to the Barzel Declaration).

36. Here again, we are forced to address the false statements in the Barzel Declaration, specifically alleging that "*Maidenbaum responded that they will continue with enforcement of the judgments to liquidate the Israeli Home…*" [paragraph 14]. Adv. Barzel is fully and unequivocally aware that at no point in time, did Maidenbaum have any control over the Receiver or his actions, who was appointed by the Registrar at the

behest of the Bank, years before the opening of Maidenbaum's Enforcement Proceeding, and acted according to his own professional discretion subject to the oversight and instructions of the Registrar. Indeed, on August 15, the Bank filed its response to the said motion holding that the sale shall be carried out.

37. As noted above, Fischman did not submit a response to the Receiver's motion to approve the sale within the time period set by the Registrar. On August 20, 2023, the Receiver filed another motion, requesting the Registrar to deliver its decision and approve the sale. On August 27, 2023, the Registrar approved the sale of the Apartment, and held that the decision should become effective as of September 6, 2023, unless an order by a competent and authorized court is presented ordering to the contrary. No order was provided, and the sale was deemed approved effective of September 6, 2023, allowing the Receiver to sign the Contract of Sale.

-- Translation of the Registrar's Decision dated August 27, 2023, is annexed as **Exhibit 6**.

38. On or about September 13, 2023 the purchaser Mr. Beer deposited the full consideration of the sale with the Authority under the Bank's Enforcement Proceeding, and after the Receiver reported the sale to the Israeli Tax Authority, the Receiver filed a motion to the Registrar to sign a sale order in accordance with Section 34A of the Sale Law, 5728-1968 (which addresses institutional sales) declaring that the Apartment is the legal property of Mr. Daniel Beer and that it is free from any mortgage, pledge, attachment, encumbrance, lien or other right of any person or entity ("**Sale Order**").

39. **On September 18, 2023, the Registrar signed the Sale Order**. Under Israeli law, such Sale Order finalized the sale of the Apartment, entitles the purchaser to be registered as title owner, and vacates any rights of any interested parties, in this case, including Fischman (and/or Nina), the Bank as a mortgage holder, and Maidenbaum as an attachment holder.

-- Translations of the Registrar's decision to (i) sign the Sale Order in accordance with Section 34A of the Sale Law, 5728-1968, and (ii) the signed Sale Order; finalizing the sale; are annexed as **Exhibit 7** and **Exhibit 8**, accordingly.

40. It should also be noted that a week or so before the signing of the Sale Order, on September 10, 2023, a hearing was held in the Magistrate Court of Jerusalem in connection with an appeal filed by Nina appealing against certain outdated decisions of the Registrar **from March 2023** regarding the evacuation of movables from the Apartment and commencement of the sale of the Apartment. Her appeal was rejected.

During the hearing, the Receiver emphasized that the Enforcement of the sale was carried out solely by the Bank, and that Maidenbaum was merely a "*hitchhiker*" in such proceedings. Following is a translation of some of his statements:

> "*This is about the realization of an asset by a holder of a security interest, the question of a third party who joined as a **hitchhiker to the matter**, the debtors, once the wife once the husband, they always did not pay in a quarter, the bank was tired of the continuation of several years when a previous case was closed, a new procedure was opened, even in the last quarter it was not paid, of course there are approved expenses, want to finish this issue.*"[emphasis added – S.G.].

Notably, Adv. Barzel, actually agreed with the Receiver's view, that the sale was carried out solely by the Bank, and that Maidenbaum was a "*hitchhiker*":

> "*[The Receiver] says the bank is fed up, so there is a procedure, the mortgage enforcement case was not filed for the entire debt but only for the arrears and they were paid to the extent that the bank was tired of acting in accordance with the provisions of the law and therefore it is true what Attorney Zentler [the Receiver] said that this is a "**hitchhiker**" because the entire procedure it was done because of the Bank of Jerusalem and they rode on it.*" [emphasis added – S.G.].

Thus, **it was undisputed that the Bank, who was a secured creditor, was the sole entity in charge of the foreclosure and sale**, and that the proceedings that led to the sale of the Apartment were initiated and controlled solely by the Bank and according to

its discretion. **However, in the Barzel Declaration, Adv. Barzel declares baseless claims that are the complete opposite of his own statements before an Israeli Court**.

41. Additionally, in the Bank's response to the above-mentioned appeal, the Bank highlighted the fact that it is pursuing the foreclosure regardless of Maidenbaum's Enforcement Proceeding, and that the two files are unrelated, as follows:

> *"The Appellant [Nina– S.G.] and Respondent 1 [the Bank– S.G.] have a long and deep dispute that is not at all related to enforcement file no 518975-10-22 (that is a case for the enforcement of a judgment in the relations between Respondent 2 [Maidenbaum– S.G.] and Respondent 3 [Fischman– S.G.]) [i.e., Maidenbaum's Enforcement File– S.G.] ... **the relationship between the debts of Respondent 3 [Fischman– S.G.] to Respondent 2 [Maidenbaum] as determined by courts in Israel, are not at the basis of enforcement file no 529055-03-18 [i.e., the Bank's Enforcement File– S.G.] in which the delay of enforcement is requested…"** [originally emphasized]*

## D. Non-Application of Fischman's Foreign Insolvency Proceedings Under Israeli Law

42. As mentioned above, any judgment or order by a court outside of Israel, including such that originate from the United States of America, is deemed by Israeli law as "*foreign*". Under Israeli law, foreign judgments, orders, or proceedings, are not automatically recognized and effective in the State of Israel, unless an authorized Israeli court declares the foreign judgment as enforceable, exactly as Israeli judgement cannot be automatically enforced in the United States.

43. Similarly, foreign insolvency proceedings, including foreign orders and stays that might arise in such insolvency proceedings, are not automatically recognized in the State of Israel. In order for such foreign order to become effective, an application for the recognition of foreign proceedings must be submitted to an authorized court in the State of Israel by a foreign officer (and not the debtor). Even after such submission, the court

14

has full discretion to either recognize the foreign insolvency proceedings or to deny the motion after considering the applicable circumstances.

44. Furthermore, I shall note that the Israeli courts have adopted the Mozambique Rule developed under British common law. The rule holds that a judicature has no jurisdiction over real estate situated abroad, since only a court with jurisdiction *in situs* can issue an order that will be effective in relation to such real estate [See, Civil Case 2416/00 Kfar Giladi quarries v. State of Israel in charge of Abandoned and Government Property in Judea and Samaria (Nevo 30.04.2006)]. For instance, in Insolvency File 3642-08-16 Adv. Yosef Bankel v. The Official Receiver (Nevo 01.23.2020), the Tel Aviv District Court held that the adequate forum to adjudicate matters relating to real estate in Germany – even in the scope insolvency proceedings – is the German court where the real estate is located].

45. By advisement of Maidenbaum's U.S. counsel, I have come to understand that despite the bankruptcy court's broad reach to assert jurisdiction over foreign property, the bankruptcy court's in rem jurisdiction cannot be enforced extraterritorially without in personam jurisdiction over the defendant; and, in other words, the bankruptcy court is precluded from exercising control over property of the estate located in a foreign country without the assistance of the foreign courts. As stated below, Fischman's insolvency proceedings were not recognized under any applicable Israeli law by any authorized Israeli court. In any event, the automatic stay did not apply *in personam* to the Bank and/or to the Receiver acting on behalf of the Bank, and as mentioned the Bank was the sole controller of the sale process with respect to the sale of the Apartment.

46. Moreover, under Israeli law, the Bank as a secured creditor, is entitled to proceed with the enforcement of the mortgage, even after the commencement of insolvency proceedings. The courts have held that:

> *"The starting point is that a secured creditor, who holds a lien and/or a proprietary pledge to secure his debt, is entitled to repayment from the debtor directly through the realization of the mortgaged property, even in a situation where an order has been*

*issued to initiate proceedings."* [See, Leave to Appeal Insolvency (Haifa District Court) 52180-11-20 Eliran Peretz v. Insolvency Commissioner for Haifa District and the North (Nevo 12.26.2020); Leave to Appeal Insolvency (Haifa District Court) 38917-09-22 Victoria Ben Zeev v. Adv. Aharon Mordechai (trustee) (Nevo 11.11.2022)].

Additionally, even during a period of stay, the secured creditor is entitled under Israeli law to carry on with the Enforcement of a secured debt, subject to certain limitations, see:

> *"... even during the period of stay, the right of a secured creditor to take enforcement procedures with respect to the property pledged in his favor is not denied, but this right is limited and subject to the provisions of Chapter V of Part D of the law, which deals with creditors with special repayment rights, including secured creditors."* [Insolvency File (Tel Aviv-Jaffa districts) 9531-05-20 Yosef Rogozinski v. Cargo Finance Ltd. (Nevo 28.08.2020)].

47. I also note that under Israeli substantive law Choshen Israel's insolvency proceedings have no direct effect on proceedings against Fischman. Israeli general contract law presumes that joint debtors are liable towards the creditor jointly and <u>severally</u>, and stipulates that a creditor may demand each joint debtor, <u>severally</u>, to fulfill the full obligation toward that creditor [Sections 54 – 55 of the Contracts (General Part) Law, 1973]. Such separate liability, of each co-debtor, also arises under Section 13 of the Law of Guarantee, 1967, which stipulates that in the case of multiple guarantors each is liable towards the creditor jointly and <u>severally</u>.

Specifically in insolvency matters, as per Section 30 of the Insolvency Law, a stay granted by a bankruptcy court in Israel is only effective in relation to proceedings <u>against the corporation itself</u> (and has no effect on other interested parties, including shareholders or guarantors). A bankruptcy court in Israel is authorized to grant a temporary stay on proceedings against non-bankrupt parties (such as shareholders or

16

guarantors) that are related to the bankrupt corporation, only if the court believes, *inter alia,* that the same is critical for the rehabilitation of the corporation.

48. Here, once again we are forced to address Fischman's misleading statements and claims. Fischman alleges in paragraph 1 of Fischman's Motion to enforce the automatic stay that *"after the Debtor filed this Bankruptcy Case, he notified the Courts of the State of Israel of his bankruptcy filing and request to stay the proceedings"*. This statement is a blatant misrepresentation, Fischman <u>*did not*</u> notify the Courts of the State of Israel or the Enforcement Office of his bankruptcy filing and <u>*did not*</u> request to stay the proceedings based on his bankruptcy filing.

    **Moreover, at no point did Fischman file any motion to any Israeli Court requesting the recognition or enforcement in the State of Israel of any order relating to his bankruptcy proceedings, or at least no such filing or notice was ever produced to Maidenbaum or his counsels.** Fischman's insolvency proceedings were not recognized under any applicable Israeli law by any authorized Israeli Court.

49. Only during the hearing that took place on <u>September 10, 2023</u> before the Magistrate Court of Israel (see section 40 above), did Adv. Barzel, indicate that <u>Fischman</u> (himself) is subject to insolvency proceedings in the U.S., and did so in passing and when it was not even relevant to the specific appeal <u>by Nina</u>. Adv. Barzel said:

    > *"...as part of the insolvency proceedings, the nature of the debt will now be examined, and it should be canceled for the simple reason that the confessions of judgment were given against an investment in a company which, according to local law, is improper conduct, and therefore as part of the insolvency proceedings in the USA that are being clarified these days within 30 days should be completed...".*

    In his decision to reject the appeal, Judge Arenberg of the Magistrate Court of Jerusalem, stated:

> *"It is not possible based on claims up in the air to delay proceedings when courts to which motions were submitted to delay proceedings rejected the motions, each for their own reasons…".*

50. Notably, even Adv. Barzel's statement above and other statements made regarding Fischman's insolvency during this hearing, were made <u>on behalf of Nina</u> and not Fischman (Nina was the only appellant, while Fischman was an unrepresented party), and Adv. Barzel actually declared that:

> *"I represented both the debtor and the applicant until the divorce proceedings that my client initiated against the debtor. I updated Adv. Zentler. To his question about how I represent the debtor, there is a conflict of interest, I replied that the matter is being examined, I also informed the Enforcement Office that the debtor is looking for another attorney.".*

Despite the above, and as further evidence of Fischman's conduct and the veracity (or rather lack thereof) of the Barzel Declaration, he now declares (only ten days later) that:

> *"I represent the Debtor in an enforcement of judgments proceeding in the State of Israel which was initiated by Shalom Maidenbaum ("Maidenbaum") against the Debtor." [see paragraph 2 to the Barzel Declaration].*

51. It seems that Adv. Barzel sometimes represents Fischman, sometimes represents Nina, sometimes represents both of them, and sometimes represents one against the other, all as they deem expedient at the moment in order to frustrate Maidenbaum and the Bank's efforts.

## E. **Summary**

52. To summarize the above: (i) the Apartment was sold in accordance with Israeli law in a sale process controlled only by the Bank and the Receiver and not at all controlled by Maidenbaum; (ii) Fischman has lost all ownership and all interest in the Apartment; (iii) the sale of the Apartment is final; (iv) Fischman never argued that there should be

18

any stay due to his U.S. bankruptcy case; (v) the automatic stay from a U.S. bankruptcy case is not recognized under Israeli law unless an application for the recognition of foreign proceedings is submitted to an authorized court in the State of Israel by a foreign officer (and not the debtor) and the Israeli court exercises its discretion to recognize the foreign insolvency proceedings; and (vi) no application for recognition was submitted in Israel for recognition of Fischman's U.S. bankruptcy case.

53. In light of all the aforesaid, by advisement of Maidenbaum's U.S. counsel based on the above, it is my belief and understanding that Maidenbaum did not violate the automatic stay of Bankruptcy Code section 362.


Dated: October 22, 2023

Tel Aviv, Israel

**Shai Ganor, Adv.**

**EXHIBIT 1**

## AFFIRMATION CERTIFYING ACCURACY
## OF TRANSLATION PURSUANT TO CPLR RULE 2101(b)

STATE OF ISRAEL       )
                          ) ss.:
CITY OF JERUSALEM    )

LINDA GALLANT, hereby affirms under the provisions of CPLR Rule 2106(b) this _5th_ day of October, 2022, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that I am physically located outside the geographic boundaries of the United States, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law:

I hereby certify that I am a Member of the Israel Bar Association since 1989 and a legal translator since 1999 and that the English translation from Hebrew to which this is attached is a true, correct and accurate translation of the original Hebrew document.

Affirmed at Jerusalem, Israel
this 5th day of October, 2022

**LINDA GALLANT**
Legal and Commercial Translator
Israel Attorney License No. 13453

לינדה גלנט, עו״ד
L.N. 13453 נ.ר.
Linda Gallant. Adv.



<div align="center">

**Jerusalem District Court**

</div>

**Civil Claim 56273-04-19 Maidenbaum v. Fischman *et al***

External case:

**Before the Honorable Judge Shoshana Leibovich**

| | |
|---|---|
| **Plaintiff** | **Shalom Maidenbaum** |
| | Represented by counsel, Adv. Shai Ganor and Adv. Joshua Lieberman |

<div align="center">

**versus**

</div>

| | |
|---|---|
| **Defendants** | **1. Aaron Fischman, represented by counsel, Adv.** |
| | **2. Nina Fischman, represented by counsel, Adv.** |
| | Represented by counsel, Advs. Tamar Rubin and Morris Rubin |
| | **3. Bank of Jerusalem Ltd., represented by counsel, Adv.** |

<div align="center">

## Judgment

</div>

1. Before me is an action for the grant of a declaratory judgment instructing that Defendant 1 is the owner of the rights in an apartment, in lieu of Defendant 2, who is registered as the owner of the rights therein, and to instruct an amendment to the record in the land register, accordingly. The remedy is requested for the purpose of execution of foreign judgments declared enforceable in Israel, which were handed down in favor of the Plaintiff against Defendant 1, according to the latter's admission of the debt.

<u>**The Background and Proceedings**</u>

2. Defendant 1, Mr. Aaron Fischman (hereinafter, "**Defendant 1**") is a businessman who resides in New York. Defendant 2, Mrs. Nina Fischman (hereinafter, "**Defendant 2**") is his wife. The Plaintiff, Mr. Shalom Maidenbaum (hereinafter, the "**Plaintiff**") is a businessman who also resides in the United States, who in the past had invested in Defendant 1's business, and against this background Defendant 1 owes him monies under final judgments.

3. Defendant 2 has a right to be registered at the Land Registry Office as owner or long-term lessee of an apartment situated in the "King David's Crown" project in Jerusalem, known as apartment no. 14 in building B3 in Block 30028 Parcel 139 (hereinafter, the "**Apartment**"). Ownership of the Apartment is still registered in the name of the Young Men's Christian Association (YMCA). The Apartment was purchased on March 13, 2008 under an agreement between Defendant 2 and Rassco Management & Development Ltd. for and in consideration of a sum of US $2,003,241. To finance the purchase of the Apartment, a loan was obtained



**Civil Claim 56273-04-19 Maidenbaum v. Fischman *et al***

External case:

from Defendant 3, Bank of Jerusalem Ltd. (hereinafter, the "**Bank**") at a rate of approximately 70% of the consideration for the Apartment (US $1,425,000). On March 17, 2008 a pledge was registered at the Registrar of Pledges in the name of the Defendants on the rights in the Apartment in favor of the Bank. Later on, Defendant 2 was registered at the Land Registration Office as having a right to be registered as owner or long-term lessee of the Apartment, under a cautionary note of March 4, 2012 with respect to the sale agreement for the Apartment. A cautionary note was registered on the same date in favor of the Bank in respect of an undertaking to register a mortgage.

4. Between the years 1994 and 2016 Defendant 1 managed companies which developed or were represented as having developed a new technology in the credit card industry. There were four such companies: Cardis Enterprises International (USA), Inc; Cardis Enterprises International, B.V; Cardis Enterprises International, N.V; and Choshen Israel LLC (the companies shall all hereinafter be referred to jointly as the "**Companies**" or "**Cardis**"). Capital was raised from investors within this framework. The monies were funded into trust accounts (IOLA accounts) in the name of an American attorney by the name of Larry Katz (hereinafter, respectively, the "**Trust Accounts**" and "**Katz**").

5. The Plaintiff invested in the Companies under Defendant 1's control by way of granting loans to Defendant 1 and the Companies. To secure the repayment of the loans, Defendant 1 and the Companies made promissory notes in favor of the Plaintiff (two promissory notes of the Companies dated February 23, 2015 and two personal promissory notes of Defendant 1 dated May 4, 2015 and June 19, 2015). The Plaintiff (*sic*) personally guaranteed the repayment of the promissory notes signed by the Companies. The debts were not repaid. The Plaintiff filed claims against Defendant 1 in the competent court in New York on the basis of the four promissory notes Defendant 1 made in his favor or with respect to which he guaranteed their repayment. In June 2016 judgments were handed down in favor of the Plaintiff in each of the claims on the basis of Defendant 1's admission of the debt in a total amount of US $3,274,540.78 (the judgments shall hereinafter be referred to jointly as the "**Foreign Judgments**").

6. The Plaintiff filed a motion in the Jerusalem District Court to declare the Foreign Judgments enforceable in Israel, pursuant to the Enforcement of Foreign Judgments Law, 5718-1958. In the absence of any objection on the part of Defendant 1, a judgment was given declaring the Foreign Judgments enforceable judgments against him (judgment in C.C. 23366-09-18 **Maidenbaum v. Fischman** (March 31, 2019)).

7. In the proceeding before me, the Plaintiff is requesting a declaration that Defendant 1 owns the rights in the Apartment, including any appurtenances and any incidental right, and he is entitled to be registered, in lieu of Defendant 2, as owner or long-term lessee and to instruct the Land Registration Office to register his rights accordingly. Likewise, the Plaintiff is



<p style="text-align:center"><span style="color:#3a5f9f"><b>Jerusalem District Court</b></span></p>

**Civil Claim 56273-04-19 Maidenbaum v. Fischman *et al***

External case:

requesting an amendment to the record in the Land Registration Office in such manner that the cautionary note under deed no. 5114/2012/1076, which was registered on March 4, 2012 in favor of the Bank, shall apply to Defendant 1's rights. Furthermore, he is requesting that the interim attachment imposed on the Apartment in his favor (according to the decision of the Hon. Registrar Tamar Bar-Asher (as she was then known) of October 11, 2018 in the aforesaid C.C. 23366-09-18) shall be confirmed and registered on Defendant 1's rights. The Plaintiff requests these remedies so that he will be able to act to realize the fruits of his win in the Foreign Judgments.

8. The focus of the dispute between the Plaintiff and the Defendants is the question whether there are "badges of fraud" in connection with the purchase of the Apartment and registration of the rights therein in Defendant 2's name, according to which it should be determined that the rights in the Apartment belong to Defendant 1. The Bank did not adopt a position on the dispute and notified that it would act according to any judgment handed down in the case.

9. The proceeding was originally filed as an originating motion, however, taking into consideration the character of the proceeding, the hearing was moved to a regular claim procedure (decisions of May 3, 2021 and May 24, 2021).
The Plaintiff supported the originating motion with an affidavit of his own and an affidavit of Mrs. Tamar Matlaw (hereinafter, "**Matlaw**"), a partner in the management company which maintained the Apartment. Later on in the proceeding, the Plaintiff filed two additional affidavits of his own, in addition to an affidavit from Mr. Seth Rosenblatt (hereinafter, "**Rosenblatt**") who worked for Defendant 1 at Cardis from 1998 until 2016.

The Defendants supported the statement of response with an affidavit from Defendant 1 (dated September 17, 2019) and later another affidavit of his was submitted (dated June 15, 2021).

10. During the proceeding, the parties filed opinions in support of their arguments.
The Defendants filed an opinion of Advocate Hameiri, an expert on foreign law, on the applicable law in their place of domicile with respect to the matrimonial property regime and fraudulent transfers. The Plaintiff filed a counter opinion from Advocate Pincus. The Defendants filed a supplementary opinion from Advocate Hameiri.
Likewise, the Plaintiff filed an opinion from Mr. Alan Blass, an accounting expert with respect to the financial sources for financing the purchase and maintenance of the Apartment and the transfers of monies from the Trust Accounts (hereinafter, "**Blass's Opinion**"). The Defendants filed an opinion from Mr. Stephan LaBarbera, an attorney and CPA, on the monies held in Defendant 2's accounts (hereinafter, "**LaBarbera's Opinion**").
The parties agreed that all the opinions would serve as evidence in the case, with a mutual waiver of examination of the experts (transcript of the hearing of January 7, 2021 and also the transcript of the hearing of October 17, 2021).



**Jerusalem District Court**

**Civil Claim 56273-04-19 Maidenbaum v. Fischman *et al***

External case:

11. During the hearing the parties submitted additional documents beyond those originally attached as appendices to the originating motion. A determination was made that the documents would be accepted as evidence, subject to any objection on their admissibility and weight (decision of January 7, 2021). No such objections were submitted and therefore all documents submitted as aforesaid constitute part of the evidence in the case.

12. The Plaintiff, Matlaw and Rosenblatt testified on behalf of the claim.
Defendant 1 testified on behalf of the defense, from his place of domicile in the United States, via videoconference.

13. I shall first review the normative basis. I shall then lay out the scope of the dispute and finally I shall decide on the ownership of the rights in the Apartment.
I should preface by saying that after having heard the testimonies of the parties and examined all the evidence presented before me, my conclusion is that the claim should be accepted.

**<u>The Normative Basis</u>**

14. Section 34(b) of the Execution Law, 5727-1967 (hereinafter, the "**Execution Law**" or the "**Law**") provides as follows:

> "The court may, on the application of the judgment creditor and upon being satisfied that certain immovable property not registered in the name of the judgment debtor belongs to the judgment debtor, make a declaration to such effect and order its attachment".

The purpose of section 34(b) of the Law is to prevent a situation whereby a debtor will misappropriate realty he owns by registering it in the name of another person, thereby violating the right of the creditor to have his debt repaid by realization of the property. The section grants the creditor a remedy in a situation where, according to what is reflected from the registration of the land, the debtor has no rights registered in any realty. This is like "piercing the veil" over the proprietary rights registered in the land to expose the "true" owner and to attribute to him the rights registered in the name of another person (see, C.A. 3122/20 **Atamna v. Amarna**, paragraph 13 and the supporting references in that case (November 11, 2021). In this manner, the property is returned to become a part of the debtor's inventory of assets from which the creditor is able to realize the fruits of his win. The arrangement determined in section 34(b) of the Law therefore protects the reasonable expectations of creditors. Although a creditor who has not guaranteed the return of his money by means of collateral is exposed to the risk of a debtor not having any assets, including real estate assets, from which he can be paid out an adjudicated debt, he nonetheless does not assume the risk that the debtor will conceal the asset from him by fictitiously transferring it



**Civil Claim 56273-04-19 Maidenbaum v. Fischman** *et al*

External case:

to another, and thereby defeating the possibility of being able to realize it for repayment of the debt.

15. It follows from the wording of section 34(b) of the Law that a precondition for the exercise of the court's authority is that the person requesting the remedy was recognized as a "judgment creditor", meaning a creditor with a right against the debtor. Another condition in the section is concerned with the burden of proof: the court must be satisfied, on the basis of all the evidence presented before it, that the realty does indeed belong to the debtor, despite the land not being registered in his name.

16. The starting point is that the registered owner is the owner of the proprietary rights in realty, according to the evidential weight attributed by the legislature to the registry (section 125(a) of the Land Law, 5729-1969). The onus of proving that land registered in the name of one person belongs to another person is on the party arguing against the record. The applicant must prove two aspects that are related to the rights in the property: first, the negative aspect, that the person purporting to be the owner according to the registry, is not; second, the positive aspect, that the debtor is the owner of the property (O.M. (Tel Aviv District) 1823/92 **Israel Discount Bank Ltd. v. Sabag**, District Court Judgments 5756(3) 421 (1996), hereinafter, the "**Judgment in the Sabag Case**"; the "**Judgment in the Frankel Case**"; and the "**Judgment in the Gelman Case**").

17. The court applies strict standards when examining such an argument because this is the extraction of realty from its registered owner, a far-reaching result that may violate the property of the registered owner. However, sometimes it may be possible to lower the onus of proof on the party arguing against the record. One means is by the rule of evidence on information that is in the defendant's possession. Another means is by presumptions of fact. In this context, Anglo-American law has developed rules on "badges of fraud" used to prove intention to misappropriate assets. Although the burden of persuasion remains on the plaintiff, the greater the number of "badges of fraud" accumulated, the more the burden shifts to the defendant to refute them and show that the transactions were conducted in good faith or there is a satisfactory explanation for them. If these presumptions remain without any response, the legal result is that they indicate the existence of fraud. Badges of fraud include, *inter alia*, a relationship between the transferor and transferee; retaining a benefit for the transferor and retaining possession; criminal investigations against the transferor; the filing of an indictment against him; his conviction on fraud offenses; suspicion of tax evasion; secrecy in financial activity; deviating from acceptable methods of business and transfer of all the debtor's assets. This is not a closed list, and may be expanded or narrowed, depending on the specific circumstances (see, C.A. 8128/06 **Levinson v. Arnon**, paragraphs 13-14 (February 3, 2009) hereinafter, the "**Levinson Case**"; C.A. 8789/96 **Pollack v. Seismic Oil Exploration Ltd. (in liquidation)** (53(5) PD 689, 701 (1999); C.A. 8482/01 **Israel Union Bank Ltd. v. Sandovsky**, 57(5) PD 776, 782 (2003); David Bar-Ophir, **The Execution**



> **System: Proceedings and Laws,** Part 2, 469 (Fifth Edition 2004)). At the end of the day, the court has to determine whether there has been an accumulation of badges of fraud to a degree justifying a shift in the burden to the defendant to refute them, according to the general picture arising from the fabric of evidence.

18.  It should be noted that the section makes no reference to the manner in which the property was conveyed from one person to another. The case law has determined that it is immaterial whether the property was registered in the debtor's name and conveyed to a third party or that it was registered from the outset in the third party's name, the debtor never being the registered owner of the property and *prima facie* having no proprietary nexus to it (C.C. (Haifa District) 11854-12-17 **Galilee Lines Regular Taxi Service Ltd. v. Badra** (January 21, 2020) hereinafter, the "**Judgment in the Galilee Lines Case**"; C.C. (Tel Aviv District) 2382/05 **Gelman v. Peri** (April 10, 2011), hereinafter, the "**Judgment in the Gelman Case**"); O.M (Tel Aviv District) 10033/99 **Abolnik v. Paz Frankel** (September 15, 2005), hereinafter, the "**Judgment in the Frankel Case**").

19.  The section also makes no reference to the debtor's economic circumstances at the time he transferred the property to another. It may be argued that in light of its purpose, it should only be applied in circumstances indicating the misappropriation of assets, such as at the time of the transfer of the property, the debtor was having economic difficulties or that legal proceedings had been filed against him establishing fear of future economic harm. However, the approach in the case law and literature is that in principle, section 34(b) of the Law may also be applied in circumstances where the transferor of the property was not embroiled in financial problems at the time it was transferred to another person, and no concrete intention was proven as to misappropriation of assets, and even if the registration was made in good faith. This is taking into consideration the purpose of the Execution Law in promoting the effective collection of debts, including to allow a judgment creditor to collect an unpaid debt in circumstances where the debtor is a hidden owner of property (see, C.C. (Haifa District) 881/03 **Mercantile Discount Bank Ltd. v. Roth** (June 17, 2012), hereinafter, the "**Judgment in the Roth Case**"; see also, O.M. (Central District) 13815-07-09 **Bank Leumi Leisrael B.M. v. David**, paragraph 8 (May 17, 2011) hereinafter, the "**Judgment in the David Case**"); David Bar-Ophir, **The Execution System: Proceedings and Laws** 623 (Seventh Edition, 2011); David Mintz, "The Marital Partnership and Mutual Guarantee Between Spouses in Bankruptcy – Reevaluation", Haifa Law Review, volume 9, 105, 123 (2015). According to this approach, it may be determined that the transferor remains the owner of the property, even if he was not in financial difficulty at the time of its transfer, if the court is satisfied that he is the true owner of the property (as in the circumstances discussed in the **Judgment in the Roth Case** in which, *inter alia* also according to this approach, the debtors continued to hold the apartment and use it for the purpose of obtaining a loan). It should be noted, also, that according to this approach, a difficult economic situation at the time of performing the transfer of property to another is likely to serve as an



**Civil Claim 56273-04-19 Maidenbaum v. Fischman *et al***

External case:

    indication that the property was misappropriated from creditors (a "badge of fraud", as shall be explained below), although this is not an essential condition.

## The Scope of the Dispute and Summary of the Parties' Arguments

20.   It is undisputed that in the present case, the preliminary condition for the application of section 34(b) of the Law is satisfied, whereby the party requesting a remedy is a "judgment creditor". As set forth above, four monetary judgments were awarded in favor of the Plaintiff against Defendant 1, according to his admission of the debt, in a total amount of US $3,274,540.78, which were declared enforceable in Israel.

    It also seems to be undisputed that section 34(b) also applies in circumstances where realty was not transferred to another, but was registered from the outset in his name. Although at first the Defendants argued that section 34(b) of the Law does not apply in the circumstances of the present case, because Defendant 1 did not transfer the Apartment to the Plaintiff (*sic*) and it was originally registered in her name, it nonetheless seems that this assertion was not wholeheartedly argued in the summations. For the avoidance of doubt, it should be noted with regard to the application of the section, that there is no impact to the property never having been registered in Defendant 1's name, but being registered from the outset in Defendant 2's name. As stated, the purpose of section 34(b) of the Law is to prevent the misappropriation of assets. In this context, the manner in which the misappropriation of the asset is performed, whether by transfer from the debtor to the transferee or by registration of the transferee as owner of the asset from the outset, is of no significance. The nature of the transfer is what is important, meaning if the true purpose of the transaction is to transfer the proprietary rights in the property to another, or the rights remained with the transferor and their transfer was only intended to "disguise them" against creditors.

21.   The dispute between the parties is on the question whether the badges of fraud, which constitute an indication of misappropriation of assets, were proven, and as a result the burden shifts to the Defendants to refute them and to show that the transactions were conducted in good faith or that there is a satisfactory explanation for them.

22.   The Plaintiff argues that clear badges of fraud exist in the present case. Among other things, there is a first-degree relationship between the Defendants; Defendant 2 herself had no financial resources to purchase the Apartment and the financing for this came from Defendant 1's financial efforts; dealings with the property management company which managed the Apartment were conducted almost exclusively by Defendant 1; Defendant 1 paid the payments in connection with the Apartment, including the mortgage payments, which continued from the date of purchase and henceforth; Defendant 1 treats the Apartment like an owner; the agreement and all the documents in relation to the management of the Apartment were signed in her name by Advocate Moskowitz, who was also Cardis' attorney; the pledge on the rights in the Apartment was registered in the Defendants' name; at the time



**Civil Claim 56273-04-19 Maidenbaum v. Fischman *et al***

External case:

of purchase of the Apartment and registration of the rights therein in Defendant 2's name, Defendant 1 was entangled in difficult financial and legal circumstances, or at least he knew it was likely that claims would be filed against him; in 1993 Defendant 1's broker's license was revoked and later Defendant 1's activities at Cardis were investigated by the authorities in the United States and indictments were filed against him. It was argued that in the absence of any explanation for all the aforesaid warning signs, it should be determined that the rights in the Apartment belong to Defendant 1.

23. On the other hand, the Defendants argue that only Defendant 2 is the owner of the rights in the Apartment. They refer on this matter to the opinions on behalf of both parties, according to which the law of the place of their domicile applies to the matrimonial property regime between the spouses. According to the foreign law which applies to the Defendants, registration of the property is the effective parameter with regard to the determination of ownership, and in the present case Defendant 2 is the registered owner of the Apartment.

24. Regarding the badges of fraud, it is undisputed that the Defendants are a couple. Likewise, after hearing the evidence, the Defendants no longer dispute in their summations that the financing for the purchase of the Apartment came from Defendant 1's financial resources, and not those of Defendant 2. The Defendants' argument is that the origin of the financing cannot in and of itself tilt the balance with respect to the badges of fraud. This is taking into consideration, *inter alia*, that there are no circumstances attesting to this being an irregular transaction; the control and possession of the property test is not satisfied; the claims and indictments referred to by the Plaintiff do not relate to the period in which the Apartment was purchased and there is not even any indication that Defendant 1 was embroiled in economic problems at that time. The Defendants argue that in the absence of circumstances of any financial difficulties or insolvency at the time of purchase of the Apartment, there is no reason to apply section 34(b) of the Law for the purpose of transfer of ownership of the rights in the Apartment to Defendant 1, in gross violation of Defendant 2's property.

## Badges of Fraud: the Factual Basis

### Preliminary note

25. Before going into greater detail, I shall first offer my general impression on the evidence submitted by the parties and the credibility of the witnesses that were heard in the proceeding. The Plaintiff, who bears the burden of persuasion that the rights in the Apartment belong to Defendant 1, supported his arguments with a broad basis of evidence. This was in spite of the fact that most of the relevant information was in the Defendants' possession and not his own, and he had to take action to obtain it. He submitted multiple documents to prove his arguments on the badges of fraud, and also Blass's Opinion, which reviews the money transfers performed by Defendant 1. The Plaintiff also brought Matlaw and Rosenblatt so



**Civil Claim 56273-04-19 Maidenbaum v. Fischman *et al***

External case:

they could testify, from their own personal knowledge, with respect to the matters at hand (I will refer below to the weight of Rosenblatt's testimony).

26. The Defendants sufficed with inadequate and laconic reference to the Plaintiff's arguments. They submitted a limited quantity of evidence which mainly consisted of the documents relating to the transaction to purchase the Apartment (such as the sale agreement, the management agreement, the appendix on modifications and the record on delivery of the Apartment). They avoided bringing evidence on material matters, such as the source of the financing for the Apartment and Defendant 1's financial conduct in the relevant years, despite the fact that this information was in their possession.

27. The same pattern also characterized the testimonies presented on their behalf. The Defendants made do with Defendant 1's affidavit to support their arguments. Defendant 2 avoided filing an affidavit from her own personal knowledge. Although at times an affidavit from one spouse who declares also on behalf of the other spouse may be adequate, in the present case it would have been expected that Defendant 2's argument that she is the owner of all the rights in the Apartment would have been supported not only by Defendant 1's testimony, where according to him the Apartment did not belong to him, but also by her positive testimony on her alleged rights in the Apartment. As is known, a litigant's avoidance of presenting witnesses and evidence found within his own possession establishes a presumption that the presentation of such witnesses and evidence would have proved the opposite to the litigant's argument (see, C.A. 256/17 **Hershkovitz v. Tax Authority**, paragraph 15 (August 18, 2019)); C.A. 8294/14 **Gangina v. Petach Tikva Assessing Officer**, paragraph 24 (March 20, 2018)); C.A. 2275/90 **Lima Israeli Chemical Industries Company Ltd. v. Rosenberg**, 47(2) PD 605 (1993)).
However, beyond this, as shall be explained below, during the proceeding it became apparent that the Defendant had declared about facts which are untrue in connection with financing the purchase of the Apartment in a manner which imposes a heavy shadow on the credibility of his testimony. Likewise, his testimony was characterized by his avoidance of answering questions where it was presumed he knows the answer, *inter alia*, by claiming he does not remember (such as with respect to the Defendants' conduct in the deposition, with respect to the Trust Accounts, etc.). In the absence of any testimony on Defendant 2's behalf, Defendant 1's testimony was all that remained, and all that this entails from the evidentiary standpoint.

28. Below I shall first examine the basis of evidence presented with regard to the "internal" badges of fraud, meaning the circumstances relating to the transaction for the purchase and maintenance of the Apartment, and thereafter the "external" badges of fraud, meaning the circumstances relating to the economic and business circumstances of the Defendants in the relevant periods.



**Civil Claim 56273-04-19 Maidenbaum v. Fischman** *et al*

External case:

Internal badges of fraud: the circumstances surrounding the purchase and maintenance of the Apartment

29. **The source of financing the purchase of the Apartment**. The source of financing for the purchase of realty is a central "badge of fraud" for a determination on a "transfer for appearance's sake". It is generally presumed that the person who financed the purchase of realty is its owner. This presumption is rebuttable, for example in a case where it is proven that parents gave an apartment as a gift to their children. However, in cases where an inadequate explanation is given for the fact that a person financed the purchase of the realty and another person was registered as the owner of the rights therein, this will be an indication of a fraudulent transfer (see, C.A. 765/18 **Hayoun v. Hayoun**, paragraphs 17-21 (May 1, 2019)).

30. In the present case, the Plaintiff argued from the start of the proceeding that Defendant 1 financed the purchase of the Apartment from his own financial resources. Defendant 2 was financially unable to finance the purchase of the Apartment because personally she has no assets or independent sources of income, certainly not in the amount required to finance the down payment ("equity") required to purchase a luxury apartment, and to pay the Bank significant amounts to cover the loan she took out for this purpose.

31. Taking into consideration the Defendants' admission on this matter in the summations, we could have shortened matters and a determination could have sufficed that it is no longer disputed that the Plaintiff proved that the Apartment had been purchased with Defendant 1's financial resources. However, in view of the Defendants' assertion that at least part of the financing (the "initial capital") originated from monies that had been transferred to Defendant 2 many years before the purchase of the Apartment, and also due to the significance in relation to the credibility of Defendant 1's testimony, I will explain the sequence of events.

32. The Plaintiff presented an increasingly "solid" basis of evidence during the proceeding to establish his argument that the Apartment was purchased from Defendant 1's financial resources.
A list of transfers made from the Trust Accounts was attached to the originating motion from which it appears that transfers were made from a trust account in a sum of US $1,750,000 to the trust account of Defendant 1's legal counsel in Israel, from the law office of Brounstein-Aboudi (hereinafter, "**Brounstein's Office**") which handled the purchase of the Apartment (Appendix 17 of the originating motion). Correspondence was also attached in connection with the payments in respect of the Apartment (Appendices 14-16). Printouts of the Trust Accounts documenting transfers of substantial amounts of money into Brounstein Office's trust account and also to the accounts of King David's Crown relating to the purchase of the Apartment (Appendix 2) were attached to the Plaintiff's reply to the Defendants' response.



## Jerusalem District Court

**Civil Claim 56273-04-19 Maidenbaum v. Fischman *et al***

External case:

Correspondence attesting to transfers made from the Trust Accounts for the purpose of the mortgage payments (Appendix 3) was also attached.

33. Later on in the proceeding, the Plaintiff submitted Blass's Opinion. The expert, who has experience in economic investigations, reviewed many documents recording the transfers made from the Trust Accounts. These documents reached the Plaintiff under a judicial order handed down on January 4, 2021 within the discovery proceedings conducted between the parties in the United States. Based on the aforesaid documents, the expert stated his opinion: "**It is clear that the sources from which the purchase of the apartment was financed (capital and mortgage) and the additional payments in connection with the apartment, the design and plans, all came from Defendant 1 (mainly via the Trust Accounts that were held by Katz for the sole benefit of Defendant 1). Katz, despite being an attorney, exploited his Trust Accounts for Defendant 1's use.**" The Plaintiff filed as evidence a CD-ROM which included all the activity in the bank accounts under Defendant 1's control or that were held for him in trust by Katz.

34. The Plaintiff's arguments concerning the sources used to finance the purchase of the Apartment were also supported by testimonies heard from him and from Rosenblatt. Both testified that Defendant 2 had never worked and she had no independent financial resources enabling her to purchase an apartment or make any significant financial contribution to any such purchase. She also never came from a family with any means and Defendant 1 supported her parents.
Rosenblatt declared that he worked for Defendant 1 and the Cardis companies between the years 1998 and 2016. Through his acquaintance with Defendant 1 he became familiar with the financial transactions between Cardis and the Defendants and Katz. Defendant 1 managed his financial affairs through Katz. All monies paid by Katz from these accounts were paid according to Defendant 1's instructions. From working with Defendant 1 over the years he was also aware of the purchase of the vacation home in Jerusalem and the payment for the initial capital and mortgage payments via the Trust Accounts.

35. Regarding Rosenblatt's testimony, it should be noted that the fact that he owed monies to the Plaintiff's sister in a manner likely to place him in a conflict of interest was taken into account with regard to its weight. On the determination of findings with respect to the financing of the Apartment, it is in any event unnecessary to rely on his testimony alone, and it only constitutes additional support for the Plaintiff's allegation within the fabric of evidence presented.

36. The Defendants at first denied the Plaintiff's allegation and argued positively that the financing for the purchase of the Apartment was made from Defendant 2's independent resources. Defendant 1 declared that only Defendant 2 owned property in Israel and she is the sole owner of the Apartment, which was purchased from her own money and with a



<span style="color:blue">**Jerusalem District Court**</span>

**Civil Claim 56273-04-19 Maidenbaum v. Fischman *et al***

External case:

mortgage. The Bank registered a lien on her rights and the loan account is solely in her name. Regarding the balance of the consideration, namely, the initial capital paid in consideration of the Apartment, Defendant 1 declared that it had been taken solely from her own funds:

> "7. Transfers of the remainder of the purchase price required was made from Nina's funds, earned mainly from previous successful investments, transferred from her account to the account of her representative in Israel, Adv. Jeffrey Moskowitz in Israel, to be paid to the contractor as per the Agreement. My wife Nina continues to send money from her account in the US in order to pay current expenses connected with her ownership of the apartment."

37. The Defendants did not specify from where Defendant 2 had a significant amount of financial resources to allow for the purchase of the Apartment. They sufficed by noting laconically that the source of the payments was mainly from "**previous successful investments**" that were transferred from Defendant 2's account to the account of her representative in Israel, Adv. Jeffrey Moskowitz, to be paid to the contractor as per the agreement. It was also argued that she was continuing to send funds from her account in the United States to pay current expenses connected with her ownership of the Apartment. Defendant 1 did not support his argument on payment of the initial capital with any evidence to show the source from which the initial amount was transferred for the purchase of the Apartment and what Defendant 2's successful investments were which it was argued allowed for the payment. This was despite the fact he could have easily done so because this was information which was in his possession. I should add that Defendant 1 referred on the matter of these payments to documents recording the financial transfer of a sum of US $12,025 from Defendant 2's account attached as Appendix B of the affidavit. A review of these documents reveals that the funds were transferred to an account in Bank Leumi belonging to Morris Rubin, their legal counsel in the proceeding before me. The fact that this is the document the Defendants chose to attach as an example of the payment of current expenses for the Apartment only reinforces the Plaintiff's arguments.

38. Later on, Defendant 1 submitted a further affidavit (on June 15, 2021) in which he declared as follows:

> "8. At all relevant times, I am aware that my wife, Nina Fischman, paid $2,065,000 to purchase the apartment in Israel from her own money. The down payment of $601,232 was paid to the contractor on March 27th, 2008 from her own money.
> 9. At all relevant times, **I did not pay for my wife's apartment in Israel.**



**Civil Claim 56273-04-19 Maidenbaum v. Fischman *et al***

External case:

      10. At all relevant times, **I did not advance any money from Cardis to finance my wife's apartment in Israel, indeed I had no role in financing the apartment**."

      (Emphasis added, S.L.)

The Defendants therefore presented an emphatic positive version of events according to which the financing to purchase the Apartment was made exclusively from Defendant 2's independent financial resources and Defendant 1 had no role in this, and there were no funds originating in Cardis.

39.    The Defendants sufficed by bringing evidence attesting to the fact that Defendant 2 had her own money. To this end they submitted the LaBarbera Opinion. The expert on their behalf reviewed Defendant 2's bank accounts from 2006 until 2013 and gave his opinion that she had US $1,793,424.71 from November 14, 2006 and she also had an additional amount of US $943,071 from before June 2008. The Opinion noted that during this period no funds were deposited into these accounts by third parties and there were no external deposits to any of these accounts. Likewise, the Defendants filed a document from the North Fork Bank in which Defendant 2's accounts were held, which specify the amounts in the accounts which served as the basis for the grant of the loan by the Bank for the purchase of the Apartment (the document is marked as Exhibit N/2).

However, the Defendants did not argue that these funds were used by Defendant 2 to purchase the Apartment. To the contrary. They confirmed that funds were not paid from these accounts to purchase the Apartment. They clarified that the opinion and the letter from the North Fork Bank were presented to refute the Plaintiff's assertions that Defendant 2 did not have her own financial means in the amount needed to enable her to purchase the Apartment (transcript of the hearing of October 17, 2021).

40.    In Defendant 1's cross examination he confirmed that Defendant 2 did not work at the time of purchase of the Apartment and is also not working at the present time. When examined with regard to the source of the funds used by Defendant 2 for payment of the down payment to purchase the Apartment, he testified that the source was in the funds he transferred to her in the 1990s that were deposited in her bank accounts, before his involvement with Cardis had begun "**[1] Because she wanted to know how she could support her family herself if something happened to me, I gave her money and I happily gave her money …and I did this a long time before, years before, in the 1990s. And this money was used as she wanted to buy an apartment. If there were financial problems 15 years later and she was troubled, various people did indeed help her to buy the apartment, myself, her brother and obviously she herself, and her savings**" (transcript, page 94 lines 6-11).



**Jerusalem District Court**

**Civil Claim 56273-04-19 Maidenbaum v. Fischman** *et al*

External case:

41. When Defendant 1 was confronted with the expert opinion on his behalf, under which no funds were withdrawn from the accounts that were deposited in Defendant 2's name at North Fork Bank, he claimed he knew nothing about this, but stuck to his version of events that the payments for the Apartment were paid from her accounts. His comments are inconsistent with LaBarbera's Opinion, which had been submitted on his behalf, from which it appears that the amounts in her account in the sum of US $2.7 million were not used to finance the down payment, because no monies were withdrawn from there until 2013. Needless to say, no evidence whatsoever was presented according to which Defendant 2 had additional accounts in which she held funds that had been transferred to her from Defendant 1, beyond the aforesaid accounts.

42. It should be noted that in a complaint filed by Defendant 2 against Judge Murphy in a proceeding conducted between the Plaintiff and Defendant 1 in the United States (see below in paragraph 77) Defendant 2 referred to these funds and declared that they originated in an inheritance from her grandfather and grandmother who had died in the early 1990s (section 39 of the complaint). This was completely contrary to Defendant 1's version of events, which was that he had transferred these funds to her from his previous investments, at her demand. In any event, even if Defendant 2 received these funds under an inheritance, it was not argued or proven that they were used or not used for the initial purchase of the Apartment.

43. It could have sufficed that the Defendants did not present any evidence on the source from which the down payment was paid to finance the Apartment, to prove the Plaintiff's argument with respect to the source of financing for its purchase. However, beyond this, in Blass's Opinion, a transfer of US $600,000 dated August 20, 2007 was traced from Katz to Adv. Brounstein via a European broker by the name of Shipley, and where, as has been said, Defendant 1 was in control of this (Appendix 1 of the Opinion). Defendant 1 declared that an amount of US $601,232 had been paid for the Apartment (section 8 of the affidavit of June 15, 2021). It is inconceivable that this is a coincidence.

44. Regarding the mortgage payments, Defendant 1's first affidavit was extremely vague in all matters relating to the source of the payments. It may be concluded from its drafting that Defendant 2 paid them because these were expenses in connection with the Apartment, or alternatively, it may be concluded that the affidavit does not address this. It is clear that the affidavit was drafted in this manner to avoid presenting a clear version of events with respect to the entire method of financing the Apartment. We should recall that in the further affidavit Defendant 1 filed, he unequivocally clarified that he had no role in financing the Apartment. He also declared that he did not pay the mortgage payments.

45. It appears from the evidence that a number of days after signing the sale agreement in respect of the Apartment, Brounstein's Office opened a trust account – Trust Account Details Keter David (see the email message from Adv. Brounstein marked as Exhibit T/21). Payments in



Civil Claim 56273-04-19 Maidenbaum v. Fischman *et al*

External case:

connection with the Apartment were made via this account, including the mortgage payments (for documentation on the transfers, see pages 202, 205, 211, 214, 220, 232, 240, 247 of the collection submitted by the Plaintiff's legal counsel at the hearing. For the correspondence relating to the transfers from this account, see: Exhibits T/22, T/23, T/24, T/26, T/27, T/28). To illustrate the point, according to the documentation that was presented, just within a period of about a year, from the end of 2013 until October 2014, funds were transferred from the account for payments connected with the Apartment in a sum of US $225,000. Brounstein's Office's trust account was closed at the end of 2014 and Defendant 1 was sent an update notice about this (letter of November 27, 2014) marked as Exhibit T/20). From that moment the transfers were made from Adv. Moskowitz via the Trust Accounts, directly to the Bank (see Appendix 2 of Blass's Opinion) and Defendant 1 continued to pay them (Exhibit T/19).

46. At Defendant 1's examination he confirmed that to purchase the Apartment a loan was taken from the Bank in an amount of approximately US $1.4 million and according to the repayment schedule, the repayment was a sum of US $28,000 each quarter and a total amount of US $112,000 a year. According to his testimony, the source of the financing for these payments was from Defendant 2's account. Regarding the source of the funds that were in this account, he testified that Katz would transfer his Cardis salary to an account that was registered in Defendant 2's name, although he argued that in reality, it was their joint account: "**Nina never received a direct payment from Cardis because she never worked at Cardis, but it was my salary that was sent to me to the joint bank account**" (page 98, lines 9-14; page 101, lines 25-26). When he was specifically asked with respect to the transfers of funds to Defendant 2's account he argued that this was semantics: "**It was a joint bank account, Aaron and Nina Fischman, for 15 years**".

47. Defendant 1 confirmed, however, that funds from Cardis were transferred to a bank account registered in Defendant 2's name, and from there the funds were transferred to finance the mortgage payments. In his testimony Defendant 1 argued for the first time that in the years 2016-2017 in which the financial difficulties started, sometimes Defendant 2's brother helped her with the mortgage payments and sometimes he also did so: "**This is the dynamic of a husband and wife**" (transcript page 93, line 23). It should be noted in this context that Defendant 1 linked the delay which occurred with the mortgage payments to the fact that in 2016, when he left Cardis, the Defendants' financial situation had deteriorated.

48. When he was confronted with the provisions of his affidavit, in which it was positively argued that no funds were transferred from Cardis to finance the purchase of the Apartment, he argued that he did not remember having done so, and he chose to stick by his affidavit, despite the fact it contradicted his comments in his testimony. It should be noted in this context that Defendant 1 also contradicted his affidavit in his testimony when he linked the difficulty in repaying the mortgage payments to the deterioration which had taken place in



**Civil Claim 56273-04-19 Maidenbaum v. Fischman *et al***

External case:

Cardis' circumstances. If Defendant 2 had paid the mortgage payments from her own funds, Cardis' circumstances should not have affected her ability to repay.

49. During the cross-examination, Defendant 1 was presented with additional evidence, part of which has been reviewed above, demonstrating that he paid the payments for the Apartment from his own resources, and he alone was involved in this, while Defendant 2 was uninvolved. Defendant 1 had no convincing explanation with regard to this evidence. For example, on June 12, 2015, Defendant 2 was sent an email message from the Bank in connection with non-payment of the mortgage debt. Defendant 2 referred the Bank's representative to the address of Defendant 1 (Exhibit T/17). Defendant 1 explained this by the fact that Defendant 2 was in all likelihood busy. Defendant 1 was referred to other email messages referring to payments for the Apartment via the Trust Accounts, with no mention of Defendant 2. He avoided comment on this by arguing that he did not remember them.

50. In view of the foregoing, on the basis of the evidence presented before me, I determine that it was proven that the payments for the Apartment, both the down payment and the mortgage payments, were paid from Defendant 1's funds that had been transferred via the Trust Accounts, and in all likelihood, the source of which were, for the most part, from Cardis. Defendant 2 had no income of her own and she did not finance the initial capital to purchase the Apartment and the mortgage payments. Defendant 1's argument that was raised for the first time during his examination, according to which the initial payment ("equity") in respect of the Apartment was financed from funds transferred to Defendant 2 at the beginning of the 1990s from his previous incomes, was unsupported by evidence and unproven. Indeed, Defendant 2 holds funds in a bank account which also, in all likelihood, originate in Defendant 1, although these funds were not used to purchase the Apartment. Defendant 1 therefore declared about facts which are untrue with regard to the source of the payments made to finance the purchase of the Apartment. Likewise, I cannot accept Defendant 1's testimony that his brother-in-law helped with the mortgage payments. This is withheld testimony that is also unsupported by any evidence whatsoever.

51. **The behavior in connection with the payments with regard to possession and maintenance of the Apartment.** Financing the upkeep of realty, including the payment to the management company which maintains it on a regular basis, the payments of city tax and such like, is likely to reinforce the indication that the rights in the property belong to the person who finances these payments. And even more so where this sign is joined by another sign of fraud concerning the financing to purchase the property itself.

52. It follows from the evidence that Defendant 1 was almost exclusively involved in the maintenance of the Apartment and financing the current payments in this regard. Defendant 1 signed an agreement on August 25, 2015 with the management company which took care of the Apartment, setting forth the conditions for the supply of services. Matlaw testified that



she was almost exclusively in contact with him, without any involvement whatsoever on the part of Defendant 2, and throughout the period of the agreement he presented himself as the owner of the Apartment. There is indeed correspondence with Defendant 2 with regard to the purchase of a washing machine and with regard to the purchase of furniture for the home (marked as Exhibit N/1), but this correspondence does not contradict Matlaw's testimony, according to which communication was almost exclusively with Defendant 1, because this was sparse and short-term correspondence (the months of October and November of 2015) which focuses on the purchase of specific appliances. Beyond this, no evidence was presented to demonstrate Defendant 2's actual involvement in connection with the maintenance of the Apartment. Rosenblatt also declared that he was witness to the close involvement of Defendant 1 in connection with matters relating to the Apartment and the financing of related expenses: renovations, furniture, hiring the services of an architect, management, maintenance etc.

53. The payments of expenses relating to maintenance of the Apartment were paid, *inter alia*, by transfers from the Trust Accounts to the property management company's account or via the account managed at Brounstein's Office (see Exhibit T/27 of the correspondence between Adv. Moskowitz and Defendant 1 concerning the various payments he had to pay in connection with the Apartment, Exhibit T/29 on payments for renovations; Exhibit 31 on the correspondence between Defendant 1 and Adv. Moskowitz on the city tax payments; Exhibits T/25 and T/31 on the correspondence between Defendant 1 and the King David's Crown sales office concerning payments for construction; Exhibit T/32 on the correspondence between Defendant 1 and Habitat on the payments for furniture purchased for the Apartment; Blass's Opinion, Appendix 3 on page 17). Matlaw confirmed in her examination that the money for the payments to her office came from Katz's trust account, although she had no idea about the source of the money.

54. Defendant 1 himself did not deny what was argued in respect of managing the upkeep of the Apartment and the payments he made in this regard. He explained that this was done so as not to confuse the people involved in the purchase the Apartment, the transfer of the financing and its day-to-day management. He argued that Defendant 2 had asked him to be the contact person, although with regard to certain matters, such as the color of the sheets and the type of vacuum cleaner, they were according to her specific instructions. Rosenblatt also testified that Defendant 1 financed all expenses in connection with the Apartment.

55. It follows from the foregoing that Defendant 1 "called the shots" in all matters relating to the Apartment, including its upkeep and payment of the current payments with respect to its upkeep.

56. **The method of transferring payments and the attorneys involved.** It appears from the evidence that Cardis' attorneys helped with the purchase and ongoing management of the



**Civil Claim 56273-04-19 Maidenbaum v. Fischman** *et al*

External case:

Apartment, via their Trust Accounts, which were used as a funnel for the transfer of funds. Adv. Moskowitz, an attorney from Brounstein's Office, handled the purchase of the Apartment. Payments on account of the mortgage and other payments were transferred, at Defendant 1's instruction, by Katz to the trust account in Israel managed by Brounstein's Office and from there they were paid, again at Defendant 1's instruction, to third parties. Defendant 1 testified that Adv. Brounstein, who was a partner in the office, handled Cardis' financial management, including expenses and payments that were under his supervision. In this way, the attorneys from Brounstein's Office handled the purchase and maintenance of the Apartment and at the same time provided professional services to Cardis.

57. **Control and possession of the Apartment.** The Plaintiff argues that also according to the test of control and possession of the Apartment, Defendant 1 is the owner of the rights in the Apartment. Although he resides in the United States, this is a permanent vacation apartment which he stays in when in Israel and he treats it as an owner would and in actuality manages it as his own. This argument was not proven. On this matter, the Defendants' argument that this was a vacation apartment used by all members of the family, was not refuted.

58. **Other internal badges.** It follows from the evidence that in the pledge registered on the rights in the Apartment, both Defendant 1 and Defendant 2 appear as debtors to the Bank. In the description of the "**Pledged Assets**" it states: "**Contractual and other rights of the debtors in the property**" (Online National Database of Pledges of the Registrar of Pledges). Likewise, Defendant 2 did not personally sign the sale agreement and all the documents in connection with it, it was Adv. Moskowitz who signed on her behalf. I should already note at this point that I do not believe that these facts, *per se*, have any effect insofar as proving a fraudulent transfer is concerned (see later in the chapter on the deliberation and decision, from paragraph 85 and henceforth).

External badges of fraud: claims, indictments and the Defendants' conduct

59. **Financial conduct: transfers of funds via the Trust Accounts**. As set forth above, Rosenblatt declared that he worked for Defendant 1 and the Cardis Companies between the years 1998 and 2016. Through his acquaintance with Defendant 1 he became familiar with the financial transactions between the Cardis Companies and the Defendants and Katz. Defendant 1 managed his financial affairs through Katz. Defendant 1 was the sole authority in all matters relating to the financial affairs with Katz's accounts. All monies paid by Katz from these accounts were paid according to Defendant 1's instructions. Rosenblatt testified that Defendant 1 "**took a lot of money from the company and his explanation, at least how he explained it, was that eventually he would sort it out because he thought that in Cardis, he would eventually be able to please everyone**" (transcript page 31, lines 5-7). As part of this, funds were taken for the purpose of the mortgage payments (*supra*, lines 8-10). He testified that Defendant 2 spent a great deal of money using credit cards. Every few



**Civil Claim 56273-04-19 Maidenbaum v. Fischman *et al***

External case:

weeks Defendant 1 would transfer a list to Katz to whom to transfer money and her name was always on the list, and he paid the accounts. Defendant 2's mother's name would also appear on these lists. Employees also received their salaries in this manner.

60. Rosenblatt's testimony was supported by Blass's Opinion and by printouts from Defendant 2's bank accounts and the Trust Accounts. These documents show that significant amounts of money were transferred from the Trust Accounts, via Katz, for the use of Defendant 1 and the members of his family. According to the statements from Defendant 2's bank account managed at HSBC in the United States, it appears that up until July 5, 2016, no less than US $4,090,080 had been transferred to her private bank account originating in the Companies. A consolidated statement from the Trust Accounts was attached to the originating motion showing that over the years cumulative payments of over 4 million US dollars had been regularly transferred from these Trust Accounts. Likewise, from printouts from Defendant 2's bank account and from Adv. Katz's bank account it appears that transfers from the Trust Accounts to Defendant 2's account were systematically and consistently made from the end of 2007, prior to the purchase of the Apartment. According to Blass's Opinion, between September 5, 2007 until February 7, 2020 almost 5 million US Dollars had been transferred to Defendant 2 (see Appendices 5 and 6 of the Opinion). It should be noted that also in the indictment filed against Defendant 1, it was estimated that at least two million US Dollars of the investors' funds had been transferred to Defendant 2 (section 99 of the indictment). Transfers from the Trust Accounts were also made during 2017, after Cardis' situation deteriorated.

61. It appears from the list of transfers made from the Trust Accounts that apart from transfers in a sum of US $1,750,000 to Brounstein's Office's trust account for the purchase of the Apartment, transfers were also made from this account for the personal needs of Defendant 1 and his family. Adv. Moskowitz therefore states in an email message of February 10, 2013, that a sum of US $48,000 was received in the account, and accounts were left to pay "Ofer", the person who was the contractor who performed the renovations in the Apartment, in a sum of US $42,000.

62. Printouts from Defendant 2's bank account documenting the transfers made from the Trust Accounts via Katz to Defendant 2, and also printouts of Katz's trust account documenting transfers of significant amounts made in these accounts to the accounts of Brounstein's Office and to the accounts of the King David's Crown company were attached to the Plaintiff's affidavit to support his response to the Defendants' statement of reply. Likewise, Blass's Opinion was submitted and also a file was submitted containing printouts of the Trust Accounts managed by Katz in three banks (at the evidentiary hearing of March 23, 2022).

63. At his examination, Defendant 1 was presented with examples of the aforesaid transfers of funds. For example, he was presented with documents demonstrating that within less than


**Civil Claim 56273-04-19 Maidenbaum v. Fischman *et al***

External case:

two weeks, three transfers in a sum of US $22,000 had been made from the Trust Accounts to Defendant 2's account. Defendant 1 testified that he does not remember this. Likewise, when he was presented with additional money transfers from 2014 that were transferred from the Trust Accounts to Defendant 2. He raised the possibility that in that year he had asked for his wages to be transferred to her account. Similarly, Defendant 1 was presented with documents showing money transfers that had been made from the Trust Accounts to his mother-in-law, and also email correspondence between him and his mother-in-law in which she asked him to arrange money transfers for her via Katz (see Exhibit T/18). In other correspondence from 2010, Defendant 2 refers him to her mother's request for a money transfer (*ibid*).

64. At his examination, the Plaintiff (*sic*) confirmed that at times he would give instructions to Katz to whom to transfer funds from there, although Katz did not always act according to his instructions, but he was unable to give further details. However, during the judicial proceeding in the United States, when Defendant 1 requested to disqualify the Plaintiff's attorney, he testified that he was the one who gave Katz instructions (Exhibit T/1 page 121, lines 17-19).

65. Defendant 1 explained in his testimony with respect to the money transfers that this was his wages which Katz transferred, at his request, to various entities, such as his wife, his mother-in-law, or for donations. He testified with respect to his mother-in-law that he helped her when she lived in the United States before she immigrated to Israel, and also that she worked in his office for many years. Defendant 1 provided no explanation whatsoever for the irregular manner in which the funds were transferred and the amounts of the transfers, and also submitted no evidence supporting his argument that these were salary payments.

66. In light of the foregoing, it has been proven that considerable amounts of monies were transferred via the Trust Accounts, all or most of which originated in Cardis, to Defendant 1's family members, and mainly to Defendant 2.

67. **Pending indictments against the debtor.** The holding of a criminal investigation by the authorities in connection with the transferor's fraudulent transactions, and even more so when an indictment has been filed in this regard, constitute highly significant "badges of fraud" (**see the Levinson Case**). As shall be explained below, the activities of Defendant 1 and the Companies were investigated by the authorities in the United States and an indictment was also filed against him.

68. On December 21, 2018, the Attorney General of the State of New York, through the Investor Protection Bureau, filed an indictment in the competent court in the State of New York against Defendant 1, Katz and others on Cardis' conduct (file no. 452353/2018, attached as Appendix 10 of the originating motion). This was a quasi-criminal proceeding whose



**Civil Claim 56273-04-19 Maidenbaum v. Fischman** *et al*

External case:

purpose was to forfeit property or funds obtained by offenses of fraud. The defendants were charged, *inter alia*, with offenses of material misrepresentations; repeated and persistent fraud and illegality; actual fraud; equitable fraud and constructive fraud.

69. In the indictment the alleged facts were described as follows:

> "4. Cardis solicited tens of millions of dollars from investors by selling stock in Cardis NV. Although Cardis did not maintain full shareholder records, Defendant **Fischman has represented that Cardis raised over $70 million, and a Cardis-maintained share registry reflects at least $30 million in stock sales since 2011**.
> 5. **Cardis was a fraud. It raised money through a steady drumbeat of false representations** that: (1) it was on the verge of monetizing its technology through agreements with prominent companies; and (2) an initial public offering ("IPO") or buyout of Cardis was on the horizon. All the while, Defendant Fischman diverted investor moneys to enrich himself, family members, and favored charities. **While the particulars of the fraud varied, these acts and practices were part of a single, continuing scheme to deceive investors and enrich Defendant Fischman**…"

> (Emphases added, S.L.)

70. The facts in the indictment stated that Cardis represented itself to investors as being on the verge of monetizing its technology through various partnerships (section 44 of the indictment). From 2011 and in the following years, various representations were made to investors that the opportunity for an exit was "around the corner". In actuality, there was no such opportunity. For example, at the end of 2012 a report was made to investors about signing an agreement and advanced negotiations with various companies, whereas in actuality, these were only preliminary contacts. The indictment also specified that while Cardis had raised tens of millions of dollars on the basis of false representations, Defendant 1 treated the company as his own personal piggy bank. From 2011, Defendant 1, with Katz's help, transferred enormous amounts for his own personal enrichment.

71. Defendant 2 did not defend herself against the charges and on January 10, 2019 a default judgment was handed down against her and other defendants for want of a defense (the judgment is marked as Exhibit T/16). It should be noted that this proceeding was stayed until a decision in the criminal proceeding which was filed thereafter, which is explained below.

72. On August 18, 2020 the New York Attorney General filed an indictment against Defendant 1 and others which included 20 different charges, including offenses of fraud and



embezzlement, after its filing was approved by a jury convened for this purpose (the indictment was attached to the Attorney General's notice of September 27, 2020). The acts of embezzlement attributed to Defendant 1 in the indictment refer to the period between 2013 and 2016. The notice issued by the Attorney General on the filing of the indictment stated, *inter alia*, as follows:

> "According to statements made by the Office of the Attorney General (OAG) at arraignment, between January 2013 and December 2016, Fischman solicited millions of dollars of investments in Cardis – a Long Island-based company that claimed to possess a patented and proprietary technology that would make low-value credit card transactions less expensive. The technology was supposed to bundle multiple transactions under one fee. Fischman and his associates promised investors that their money would be used to promote the business of Cardis. However, **today's criminal charges allege that instead of using the money for business purposes, Fischman secretly devised a plan to divert millions of dollars of investor money into his personal bank accounts, to members of his family who had no business association with Cardis, and to selected charities**".

> (Emphases added – S.L.)

The notice also stated that in the end, few, if any of these investors received any return on their investment and most lost everything. The investors in Cardis were instructed by the employees of the company to wire money or write checks to multiple Interest on Lawyer Accounts (IOLA). Between January 2013 and December 2016 over 22 million dollars of investor money flowed into four IOLA accounts and another business account. Of this amount, prosecutors allege that more than 3 million dollars was diverted for the benefit of Defendant 1 and members of his family, and was used for the management of their lavish lifestyle.

73. It should be noted that civil claims were also filed against Defendant 1 on grounds of securities fraud and enrichment. It appears that the civil claims filed by the investors were abandoned, according to the Plaintiff, due to the difficulty in proving fraud to the standard required in the relevant law and in the absence of assets from which it was possible to collect. Likewise, the Plaintiff filed against Defendant 1 and others a RICO claim (Racketeer Influenced and Corrupt Organizations Act codified at 18 U.S.C. §§ 1961-68). This is a quasi-criminal proceeding, including monetary sanctions. The RICO claim was dismissed *in limine* on March 25, 2020, without any decision having been made on the merits, in the absence of the high standard of particulars required in claims based on the alleged acts of mail and wire fraud (Maidenbaum v. Fischman, 18-CV-2911).



74. To complete the picture, it should be mentioned that in the 1990s, Defendant 1 admitted and was convicted by the American Securities & Exchange Commission, *inter alia*, with respect to market manipulation and breach of his reporting duties and his broker's license was revoked (attached as Appendix 9 of the originating motion).

75. We should preface by saying that while the Plaintiff regards the filing of the aforesaid indictments as a clear indication of fraud, the Defendants argue that the aforesaid events occurred after the purchase of the Apartment and therefore it should not be regarded as a sign of fraud. I will discuss these arguments below.

76. **The Defendants' conduct in the proceedings being conducted in the United States.** Defendant 1's conduct within the legal proceedings being conducted against him is also likely to constitute a badge of fraud or reinforce the other badges.

77. It appears from the evidence that in the proceeding conducted between the Plaintiff and Defendant 1 in the United States in connection with the Cardis affair, the Defendants adopted intentional tactics to wear him down and delay the examination of the action. In a decision which was handed down in a contempt of court petition against the Defendants and Katz, it stated that the Plaintiff had made many attempts to serve a summons on Defendant 2 and Katz (the decision of May 15, 2020, marked as Exhibit T/2). However, even after this decision, Defendant 2 caused a postponement of the dates set for the deposition on a number of occasions under various pretexts (see the decision of the court of August 18, 2020, Exhibit T/3, and letters from Defendant 1's legal counsel dated March 10, 2021, Exhibit T/4, of April 8, 2021, Exhibit T/5, and of April 11, 2021, Exhibit T/6). When she deigned to attend the deposition proceeding by video conference, Defendant 2 appeared wearing a head covering and mask in a manner making her examination difficult (her picture was marked as Exhibit T/7), transcript of deposition hearing marked T/8). Later on, an order was given under which the deposition would be performed in court (order of May 11, 2021, marked as Exhibit T/9). On the date on which she was required to appear in court, she and her legal counsel did not appear to the hearing, and instead, a motion was filed for a protective order to stop her deposition (transcript of hearing of June 5, 2021, marked as Exhibit T/10). In consequence of this, a date was set for a hearing in the contempt of court petition against her. On the date set for the hearing, Defendant 2 and her legal counsel did not appear. Instead, another person appeared who filed a civil complaint against the judge on the ground of gender discrimination and conspiracy between the judge and the Plaintiff's legal counsel (the complaint was marked as Exhibit T/12). The complaint asserted, *inter alia*, that the court had adopted an outdated approach, believing that a wife's assets belong to her husband. It was also argued that the judge had directed the Plaintiff's legal counsel to file a claim in Israel with regard to the Apartment because under the "outdated" ante-diluvian law which still applies in Israel, a wife's assets belong to her husband (section 51 of the complaint).



**Jerusalem District Court**

**Civil Claim 56273-04-19 Maidenbaum v. Fischman *et al***

External case:

The complaint was dismissed a short time later by a federal judge (the decision was marked as Exhibit T/13). Following the complaint, the judge who heard the case recused himself from hearing their case and another judge was appointed. The substitute judge handed down a decision on January 19, 2022 dismissing Defendant 2's motion for a protective order, accepting the Plaintiff's contempt of court petition and held that the Defendants had to appear to the deposition on the date set and bring with them the documents required (decision of January 1, 2022, marked as Exhibit T/14), but they did not appear (transcript of deposition of February 23, 2022, marked as Exhibit T/15).

78. When Defendant 1 was examined about Defendant 2's conduct, he argued with regard to some of the events that he did not remember them (despite the documentation and despite the fact that not much time had elapsed since then) and with regard to the other events he argued that Defendant 2 acted in the way she did because the Plaintiff had abused the proceedings against her and harassed her, despite the fact that she had no connection to the management of Cardis. He confirmed that Defendant 2 filed a complaint against the judge who had heard the case, but argued that the complaint was filed independently by her, he did not know who had helped her with it, and he had not read its content. It goes without saying that it is difficult to believe his statements.

79. It should be noted that also in the hearing before me, Defendant 1 did not appear to the examination in the first hearing and submitted a medical document stating that he was sick with Covid-19. However, at his examination on the adjourned date he did not deny that on that same day he had left his house, and he said that maybe he had gone to synagogue.

80. The impression gained from the evidence presented with regard to the Defendants' conduct in the proceeding being conducted in the United States is that the Defendants are attempting to avoid giving testimony and from filing the relevant documents in their case. We should recall that in the proceeding before me, Defendant 2 chose not to testify at all, despite the Defendants arguing that she is the owner of the Apartment.

81. **The Defendants' financial circumstances.** Rosenblatt declared, to his best knowledge, that already in 2006 and up to the present day, Defendant 1 had accumulated significant personal debts. His financial circumstances did not allow him to pay his debts or cover his guarantees. These debts include personal credit card debts, promissory notes signed by him personally and for which he was a surety for their payment and loans of the Companies he controlled and financed by thin capital. Over the years Defendant 1 "juggled" debts and failed to meet his undertakings, while channeling all his assets and funds to his wife. The funds transferred to Defendant 2 were used to finance their lavish lifestyle. In his testimony he described a situation in which the business was perpetually in debt: he delayed the payment of rent, payments for office equipment and payment for the Defendants' rental cars. Defendant 1 would decide with regard to the priority of the payments and in the end, Katz would pay



**Civil Claim 56273-04-19 Maidenbaum v. Fischman *et al***

External case:

them all. Rosenblatt also testified that he would sign on the credit cards in his possession and in the possession of the Defendants, because in 1998 Defendant 1 did not have credit allowing him to be issued with them himself.

82. As mentioned above, there was some difficulty in relying on Rosenblatt's evidence as single testimony, taking into account his large monetary debt to the Plaintiff's sister. Despite the foregoing, in the specific circumstances I see fit to rely on his testimony for the purpose of the determination on the factual findings. As set forth above, Defendant 1 chose to transfer significant amounts of money to members of his family, and first and foremost to Defendant 2, even from 2007. These funds served to pay for their lifestyle. Defendant 1 has the information about their financial conduct and could have easily presented evidence on this matter. If he did not do so – there is a presumption that presenting it would have operated to his detriment. In this context, it is not enough to refer to Defendant 2's accounts, which were reviewed in LaBarbera's Opinion, to indicate stable financial circumstances. For this purpose, it is necessary to see the whole picture, meaning all the income and expenses of the Defendants in the relevant years.

83. In view of the foregoing, the argument that Defendant 1's financial circumstances at the time of purchase of the Apartment were not firm and stable, was not refuted.

The factual basis on the badges of fraud: summary

84. Among the internal badges of fraud, it was proven that the Apartment was purchased from monies originating in Defendant 1, mainly from Cardis, and this is also the case with respect to payment of the mortgage repayments made by Defendant 1; Defendant 1 also financed current payments in connection with its upkeep, and managed it exclusively, and the attorneys who were involved in the purchase and maintenance of the Apartment were also Cardis' attorneys. Among the external badges of fraud, it was proven that through the Trust Accounts managed by Katz, which were controlled by Defendant 1, significant amounts of money were channeled from Cardis to members of Defendant 1's family, and mainly to Defendant 2, including for the purpose of financing the purchase of the Apartment. Criminal proceedings were filed against Defendant 1, which are still pending, *inter alia*, with respect to the money transfers. The Defendants' conduct in the case being conducted in the United States between the Plaintiff and Defendant 1 demonstrates the attempts to evade and obstruct the examination of the claim and the Plaintiff's argument that even in the period when the Apartment was purchased, the Defendants' financial circumstances were unstable, was not refuted.

**Deliberation and Decision**



**Civil Claim 56273-04-19 Maidenbaum v. Fischman** *et al*

External case:

85.   Are the facts as proven, as set forth above, sufficient to establish badges of fraud to the standard required to shift the burden to the Defendants to provide an explanation for registration of the Apartment in Defendant 2's name and did they meet this burden?

86.   The Defendants' reply to this in the negative. According to them, in the specific circumstances there is no reason to determine that the rights in the Apartment belong to Defendant 1 because no badge of fraud exists regarding serious financial circumstances or insolvency at the time of its transfer. The indictments filed against Defendant 1 are concerned with events which it was alleged took place from 2013, and they do not relate to the period of time in which the Apartment was purchased. The RICO claim which the Plaintiff filed against Defendant 1 was dismissed. In these circumstances, it cannot be argued that the purchase in Defendant 2's name only was intended to misappropriate property immediately prior to the filing of a claim under threat of claims or on a date on which a future claim had ripened which the Defendants had feared.

87.   It was also argued that although it was possible that the way in which the Cardis accounts had been managed, via the Trust Accounts, was irregular, but this was apparently not illegal conduct because Defendant 1 had not been charged in connection with this. There is no prohibition on transferring salaries to any account whatsoever, including trust accounts. All salaries, including Rosenblatt's salaries, were paid via the Trust Accounts, as were the payments to the credit card companies. Since this was the way in which everyone was paid, this should not be regarded as a sign of fraud. With regard to the way in which Defendant 2 appeared to the deposition, this should be looked at in the context of the time of the coronavirus pandemic when people were extremely anxious over the risk of infection.

88.   The Defendants further argue that contrary to the testimony of the Plaintiff and of Rosenblatt, Defendant 2 has her own independent sources of money originating in funds transferred to her from Defendant 1 in the 1990s from various businesses he managed. Defendant 2 had wanted to purchase the Apartment in Israel. The couple, who are not in strained financial circumstances, have a right to plan and decide how the Apartment will be registered. A wife may take charge of her future and the future of her children and plan the registration of property so that it will be protected against possible future business risks in connection with her husband's business.

89.   The Defendants' arguments should be dismissed. It is first important to reemphasize that we are concerned here with a claim under the Execution Law whose purpose is to allow the Plaintiff to be paid out the adjudicated debts which Defendant 1 owes him in a sum of over three million US dollars. The existence of badges of fraud is not examined technically and narrowly, but according to the picture which arises from the totality of the evidence. All the relevant information on the matter is in the Defendants' possession, and they are therefore able to refute the badges of fraud by providing an explanation as to the acts committed,



**Civil Claim 56273-04-19 Maidenbaum v. Fischman *et al***

External case:

supported by the appropriate evidence. If they did not do so – and the badges of fraud remain without any explanation – it should be determined that the Plaintiff shifted the burden of proving intention to misappropriate the Apartment from creditors and that the rights therein belong to Defendant 1.

90. On the merits, from the facts determined above, on the basis of the evidence presented by the Plaintiff, the existence of badges of fraud in connection with registration of the Apartment in Defendant 2's name was proven to a sufficient standard, and even beyond this. The Defendants failed to meet the burden of refuting these badges, and I shall explain the reasons for this below

91. In my opinion, in the specific circumstances, the internal badges of fraud are sufficient to shift to the Defendants the burden of providing a satisfactory explanation for the way in which the Apartment was registered. Registration of the Apartment in Defendant 2's name in circumstances where its purchase was financed by monies fully originating in Defendant 1 constitutes a clear badge of fraud. In order to prove this badge of fraud, where the information about it was in the Defendants' possession, the Plaintiff was forced to conduct discovery proceedings within the proceedings that were conducted in the United States and to hire the services of an expert investigator. Despite the difficulty in this, the Plaintiff succeeded in proving both the negative aspect – that Defendant 2 could not have purchased the property from her own independent financial resources, and the positive aspect – that Defendant 1 had financed it. The Defendants' version of events, according to which Defendant 2 had financed the purchase of the Apartment from her own money and Defendant 1 had no involvement in this, turned out to be not credible. It should be noted that contrary to what was argued by the Defendants, it was determined above that Defendant 2 did not use the funds that had been transferred to her from Defendant 1 from his previous businesses for the purchase of the Apartment, but funds which originated, for the most part, in Cardis.

92. Added to the fact that Defendant 1 financed the purchase of the Apartment, the weight of which is significant *per se*, are facts which are not in themselves sufficient to tilt the balance, although they significantly reinforce the badges of fraud. For instance, the fact that Defendant 1 also financed the current payments in connection with the upkeep of the Apartment and managed it exclusively. Indeed, sometimes one spouse takes it upon himself to handle the affairs of the other spouse. However, in the present case, in which it was proven that Defendant 1 had financed the purchase of the Apartment, the facts that he financed the payments in connection with the Apartment, and was exclusively responsible for its upkeep, reinforces the indication of a fraudulent transfer. Further reinforcement may be found in the way in which the funds were transferred to finance the purchase of the Apartment, via Trust Accounts that were used for the transfer of funds from Cardis, and also that Cardis' attorneys handled the purchase of the Apartment and matters relating to its upkeep. Without expressing an opinion with respect to the described conduct from the standpoint of the way Cardis was



managed, the involvement of Cardis' lawyers in the purchase of the Apartment and the way the funds were transferred, reinforces the argument that the rights in the Apartment belong to Defendant 1 and not Defendant 2.

93. The Defendants could have refuted the badges of fraud by providing an explanation on the registration of the Apartment in Defendant 2's name instead of Defendant 1's name, or at least that the Apartment was not registered in both their names, despite the fact that it was financed and maintained by Defendant 1. However, in view of their assertion that the Apartment was purchased from Defendant 2's own financial resources, no such explanation was provided. The explanation raised for the first time in the summations cannot be accepted, that a wife can take charge of her future and the future of her children and plan the registration of the property so that it will be protected in the future against possible business risks in connection with her husband's business. Underline First, as may be recalled, Defendant 2 chose not to present her version of events, and it is clear that the summations are not the appropriate place to do so. Certainly, there is no justification for Defendant 2 to make such assertions which are unsupported by her testimony. Underline Second, from the way the remarks were drafted in Defendant 1's laconic and vague affidavit, it appears that the financing of the Apartment was made from Defendant 2's own independent resources, which have no connection to Defendant 1. In his examination, Defendant 1 clarified that the source of the funds in Defendant 2's accounts was his income. The Defendants cannot be permitted to refute the badge of fraud by raising an alternative version of events instead of Defendant 1's original version of events which collapsed (C.A. 765/18 **Hayoun v. Hayoun**, paragraphs 17-21 (May 1, 2019)). Underline Third, it follows from Defendant 1's testimony that this explanation, that Defendant 2 wanted to protect the funds originating from previous investments, refers to the initial capital paid in respect of the Apartment. Defendant 1 argued that these were funds that had been deposited in Defendant 2's account back in the 1990s. However, on the basis of the evidence presented, this argument has no leg to stand on. It was determined above that Defendant 2 did not use the funds deposited in the past in her accounts to finance the initial capital for purchasing the Apartment. Underline Fourth, the version of events suggested does not explain the mortgage payments, which constituted 70% of the consideration for purchasing the Apartment. There was no explanation as to why the Apartment was registered in Defendant 2's name when the mortgage payments were paid from funds originating in Defendant 1's regular business. Regarding these funds, this is certainly not the case in which a business person enters a new enterprise and his wife wants to register a property in her name which was purchased from his previous businesses.

94. It follows from the foregoing that the Defendants failed to provide a satisfactory explanation as to why Defendant 2 was registered as owner of the rights in the Apartment. In the absence of such an explanation, the internal badges of fraud were not refuted, showing that the rights in the Apartment belong to Defendant 1 and not Defendant 2.



External case:

95. According to the approach which suggests that section 34(b) of the Law also applies at a time when the true owner is not embroiled in financial difficulties and the registration in the name of another person was not done to misappropriate [property] from creditors who in real time come knocking on the door of the true owner, the foregoing is sufficient for a determination that Defendant 1 is the owner of the rights in the Apartment. The reason for this is as follows: "**A situation in which a debtor does not pay his debt, and against this, he is the hidden owner of realty, and due to its registration in the name of another person the creditor is unable to be paid out from him, undermines the object and purpose of the Execution Law and disturbs the balance between the rights of the creditor and the rights of the debtor**" (**the Judgment in the Roth Case**, paragraph 28). Judgments must be performed, and a person who has a final judgment in his favor is entitled to performance of the judgment. And in the present case, we cannot allow a situation in which Defendant 1 owes adjudicated debts for considerable amounts to the Plaintiff, while still in the possession of a luxury apartment in Jerusalem which was registered in his wife's name.

96. However, in the present case I believe that there are also external badges of fraud, which join the internal badges of fraud, demonstrating that the Defendants conducted themselves in a way which created a fear of debts, legal proceedings, indictments and investigations. It should be recalled that the Plaintiff is not required to prove within these proceedings, that the transfers of funds to the Trust Accounts were illegal or were made by embezzlement of the investors in Cardis by diverting its resources for their own personal uses. Likewise, the test is not whether there are creditors at the same time as a specific act is being performed. It is necessary to examine if the Defendants' conduct was such that they could have anticipated becoming embroiled in financial difficulties and debts.

97. The Defendants do not deny that the way the Cardis monies were managed deviated from the usual and ordinary course of business in commercial companies. Ordinarily, a business is not managed in such a way that a salary is received via an attorney's trust funds, from which transfers of money are made, at the instruction of Defendant 1, to members of his family, including his mother-in-law, for charitable donations and to credit card companies. However, anyone who transfers significant sums of money in this way for personal purposes from an attorney's trust account which is connected with a business, should fear the risk of exposure to creditors or potential creditors. And indeed, indictments which constitute a highly significant badge of fraud, were filed with respect to this conduct. We should recall that the first indictment refers to events starting in 2011. These were years in which the mortgage payments were paid with respect to the Apartment, performed by Defendant 1, with funds originating in Cardis. Regarding these years, there is certainly a clear indication that there was a real fear of claims. Although the events forming the subject of the indictment do not refer to the way in which the Apartment was purchased and the surrounding years, it does appear from the evidence that in these years too, this involved the same business which



was managed according to exactly the same irregular pattern of conduct. I believe that in these circumstances, the Defendants' argument that the indictments did not refer to the period in which the Apartment was purchased, is inadequate. The reason for this is likely to be rooted in reasons relating to the standard of proof required in a criminal proceeding, or the statute of limitations, and such like. Taking into consideration the fact that the information with regard to their financial conduct is in the Defendants' possession, they were under a burden of showing that their conduct in that period did not establish any fear of debts and claims. In other words, the Defendants had to show that until 2011, the circumstances were different, but they failed to do so. To the contrary, the Defendants' mode of conduct in the proceedings conducted against them, both before me and in the United States, demonstrates a pattern of conduct of concealment and hiding. As set forth above, Defendant 1's testimony on central issues was revealed to be not credible and was generally characterized by evasion from giving clear and coherent testimony. Defendant 2 never made the effort to testify, despite the obvious importance of her testimony in the specific circumstances. The Plaintiff was forced to obtain the documents on the transfers of money through discovery proceedings, and hiring the services of an expert. In the proceeding abroad the Defendants adopted intentional delay tactics to delay the examination of the claim against them.

98.  To conclude, it is my opinion that the internal badges of fraud that were proven are sufficient to lead to a conclusion that their financial conduct established fear from potential creditors. Added to these badges are also the external badges of fraud, which together create a clear picture that we are concerned here with a fraudulent transfer.

## Concluding Comments

99.  **Opinions on foreign law**. It is undisputed among the experts on behalf of the parties that according to the foreign law applicable to the spouses, ownership of the Apartment belongs to Defendant 2, since she is the registered owner. However, on this matter I accept the Plaintiff's position that the laws dealing with spousal property are not relevant to the present matter. This is because the cause of action forming the basis of the action is not based on the Defendants being a married couple, and this is not an assertion of an assumption of joint property, but causes of action under the general law on misappropriation of assets concerned with registration for appearance's sake, fraudulent transfer, etc. (see the **Judgment in the David Case**).

100.  Also, with regard to the foreign law applicable on the issue of fraudulent transfers, I accept the Plaintiff's position that the applicable law is determined according to the place where the property forming the subject of the proceeding is situated (see, Celia Wasserstein Fassberg, **Private International Law,** 1017, 1022 (2013); originating motion 590/92 **Reich v. Reich** (September 2, 1993)). In the present case we are concerned with collection proceedings with



## Jerusalem District Court

**Civil Claim 56273-04-19 Maidenbaum v. Fischman *et al***

External case:

regard to property located in Israel for the purpose of performance of a final judgment against a debtor (see, Celia Wasserstein Fassberg, **Foreign Judgments in Israeli Law: Deconstruction and Reconstruction** 219 (1996), hence the applicable law in the present case is Israeli law.

101. **The Apartment as joint property.** In their reply to the originating motion, the Defendants argued that "**If the Hon. Court is to determine that there is a basis for declaring the apartment to be joint property, the Respondents will argue that the rights in the apartment should be divided in equal shares …**". The Defendants did not therefore argue as an actual alternative argument on their part that this was joint property. Accordingly, they did not argue or prove any intention of joint ownership of the Apartment. To the contrary, Defendant 1 argued that all the rights in the Apartment belonged to Defendant 2. The opinion of the expert on their behalf, Adv. Hameiri, was filed to prevent the Plaintiff's argument that half of the rights in the Apartment belong to Defendant 1. This was done because, on the face of it, these were arguments that were incompatible; it is not possible to argue at one and the same time that a specific property belongs exclusively to one of the spouses, and alternatively, that there was an intention of joint ownership of such property, and therefore it is joint property. Also, the Defendants stuck to their assertion that this was separate property and they did not plead as an alternative assertion that the rights in the Apartment belong to both spouses. In these circumstances, there is no reason to discuss the possibility that this is jointly owned realty.

## Result

102. In view of the foregoing, I determine that it has been proven to the required standard that Defendant 1 is the owner of the Apartment. Furthermore, I declare that Defendant 1 is the owner of the rights in the Apartment and instruct the Registrar of Land to amend the register accordingly. The cautionary note under deed no. 5114/2012/1076 registered on March 4, 2012 in favor of the Bank, shall apply to the rights of Defendant 1.

103. According to the procedural arrangement agreed between the parties (see the decision of January 23, 2022), I order that the Bank shall be joined as debtor to Execution Office File 529055-03-18. The Bank may continue the Apartment enforcement proceedings against Defendant 1 from the place where the proceedings against Defendant 2 were discontinued.

104. Likewise, I order the confirmation of the attachment imposed on the Apartment (according to the decision of the Hon. Registrar Tamar Bar-Asher (as she was then known) of October 11, 2018 in C.C. 2336-09-18)) and a permanent attachment is hereby granted on Defendant 1's rights in the Apartment.



**Jerusalem District Court**

**Civil Claim 56273-04-19 Maidenbaum v. Fischman** *et al*

External case:

105. Taking into consideration the amount of work invested in the case, the Defendants shall bear the Plaintiff's attorney's fees in a sum of NIS 75,000, and they shall also bear the litigation costs. There is no order for costs in favor of the Bank.

**The Court Office shall send the judgment to the parties**.

Handed down today, 6 Elul, 5782, September 2, 2022, in the absence of the parties.

(- *signature* -)
Shoshana Leibovich, Judge

**EXHIBIT 2**

*APOSTILLE*

*(CONVENTION DE LA HAYE DU 5 OCTOBRE 1961)*

1. COUNTRY: UNITED STATES OF AMERICA
2. THIS PUBLIC DOCUMENT HAS BEEN SIGNED BY:
   YOEL WEISSHAUS
3. ACTING IN THE CAPACITY OF:
   NOTARY PUBLIC OF NEW JERSEY
4. BEARS THE SEAL/STAMP OF:
   YOEL WEISSHAUS, NOTARY

CERTIFIED

5. AT TRENTON, NEW JERSEY

6. THE 29TH DAY OF JUNE 2021

7. BY: Elizabeth Maher Muoio
   State Treasurer

8. NO: A756379

9. SEAL/STAMP:                    10. SIGNATURE



Elizabeth Maher Muoio
State Treasurer

Certificate Number: 143080037
Verify this certificate at
https://www.njportal.com/DOR/businessrecords/Validate.aspx

## AFFIDAVIT

I, the undersigned, Aaron Fischman, US passport no. 112259169, having been warned that I must tell the whole truth and only the truth or face the penalties proscribed by law, hereby affirm as follows:

1.      I hereby declare that I am fully aware of the Israeli penal code provisions concerning perjury in Court, and my signature on this affidavit qualifies it to be deemed true testimony given in a court of law.

2.      I am providing this affidavit to rebut to the false allegations made by Seth Rosenblatt in his affidavit dated the 12th day of March 2021.

3.      I unequivocally deny all assertions made against me by Mr. Rosenblatt in his affidavit as false, 1 through 14 and state the following in response.

4.      Between 1994 and 2016, I worked as a manager for Cardis Enterprises International, B.V. and Cardis Enterprises International, N.V. ("Cardis").

5.      At all relevant times, all financial management of Cardis, including spending, disbursement, was subject to the oversight of Gerald Brounstein Esq. In or about 2011, Stephen Brown joined Cardis as a Certified Public Accountant to assist Mr. Brounstein in the financial management of Cardis.

6.      Over several years, Cardis would issue financial statements that was reviewed and audited by a certified accountant. For the years 2009-2012, Mr. Brounstein issued financial statements and every penny was accounted to the investors.

7.      My role at Cardis involved in business development of credit card processing software, by developing partnerships for pilots to commercial license Cardis's software and bringing it to the marketplace. I also was a coordinator for raising capital for Cardis. The software

was completed, promoted in the marketplace. For unrelated reasons the software did not take off as initially planned. However, the software was licensed for several companies, and its promotion could have continued, if not for Shalom Maidenbaum's interference against anyone interested in licensing the software, the investors of Cardis, including Maidenbaum, could have realized a return from their investment in Cardis.

8.     At all relevant times, I am aware that my wife, Nina Fischman, paid $2,065,000 to purchase the apartment in Israel from her own money. The down payment of $601,232 was paid to the contractor, on March 27th, 2008, from her own money.

9.     At all relevant times, I did not pay for my wife's apartment in Israel.

10.     At all relevant times, I did not advance any money from Cardis to finance my wife's apartment in Israel, indeed, I had no role in financing the apartment.

11.     At all relevant times, I did not consult with Mr. Rosenblatt about my wife's apartment in Israel, since my wife did not seek any advice from Mr. Rosenblatt.

12.     The court should be made aware that after Cardis' financial picture deteriorated, Mr. Rosenblatt insisted that I continue paying for benefits he was receiving from Cardis, including a car lease and health insurance, despite the lack of any company funds to support this expense. Mr. Rosenblatt threatened me to divulge false information to Mr. Maidenbaum in exchange for money in the ongoing vendetta Mr. Maidenbaum has launched against me. For example:

13.     It should be noted that over the years I paid for the health insurance of Mr. Rosenblatt. More recently, I ended the health insurance coverage for Mr. Rosenblatt. Thereafter, on August 20, 2020, Mr. Rosenblatt called me to threaten that if I do not restore his health insurance coverage then he would seek employment with Mr. Maidenbaum in exchange for health insurance. Thereafter, I learned that Mr. Rosenblatt has a serious addiction to pharmaceutical opioids and that he is willing to say whatever will lead him to get access to drugs.

14.    In addition, Mr. Rosenblatt is indebted to Mr. Maidenbaum for three mortgages, which can be found on https://a836-acris.nyc.gov/. Attached as Exhibit A is a true copy of the first mortgage of $115,000 was issued August 7, 2017. Attached as Exhibit B is a true copy of the second mortgage of $100,000 was issued August 22, 2018. Attached as Exhibit C is a true copy of the third mortgage of $75,000 was issued November 19, 2020. In each of these mortgages, Mr. Maidenbaum uses the name of his sister, Rachell Gober, and using his firm, Maidenbaurn & Sternberg, LLP to execute them.

15.    Further, Mr. Rosenblatt's affidavit is inadmissible, since it was notarized by Jonathan Stein, who is Mr. Maidenbaum's partner in the purported judgment. Under New York Law, a party with a financial interest cannot notarize documents in which advances the personal interest of the notary.

16.    This is my name, this is my signature, and everything written above is the truth.

Dated: New Milford, NJ

    June 15, 2021

Aaron Fischman

On the 15th day of June in the year 2021 Aaron Fischman before Yoel Weisshaus, personally appeared, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is Aaron Fischman and subscribed to the within instrument and acknowledged to me that he executed this instrument as an affidavit. I am not an interested party to this affidavit. I warned him that willful false statements are punishable by law, affirmed to me that the contents of this document are truthful and accurate to the best of his knowledge and belief.

Signature of Notary Public

Dated: New Milford, NJ

June 15, 2021

YOEL WEISSHAUS
Notary Public
State of New Jersey
My Commission Expires Apr 8, 2025

**EXHIBIT 3**

## The State of Israel - The Enforcement and Collection System Authority

**Execution Office, Jerusalem Bureau**
**File 529055-03-18**
**Real Estate Mortgage Other**

**In front of Hon. Registrar Assaf Avni**

      **Motion No.: 5 dated 18 March 2019**
      **Motion Type: 988 General Motion**

      **The Applicant:**      **Creditor 1, Bank of Jerusalem Ltd.**
      **In the Matter of:**      **Debtor 1, Neema Nina Fischman Passport 211450226**

Description of Motion: Motion for the Provision of a Decision

### Decision

1. On the basis of the reasoning of the Creditor's attorney's motion and in the absence of settlement of the arrears on the loan as agreed with Mr. Fischman Aaron - the Debtor's proxy in Israel, I order the provision of order for the appointment of a receiver and instructions for the receiver (according to sections 3a(b), 53 and 54 of the Execution Law, 1967 (hereinafter: "the law").

2. Since the debtors, as defined below, did not repay their debt despite the warning they received, an order is hereby issued for the realization of a pledge/mortgage.

3. For this purpose, I hereby appoint Adv. Emmanuel Zentler I.D. 50496520 as a Receiver of the rights of the Debtor Neema Nina Fischman US passport 211450225 (hereinafter: "the Debtor") in the property known as Block 30028 Parcel 139 (previously part of parcel 70 book 1015 pages 1054 and 2284) lot 1 through 6 according to plan 4715 Jerusalem as detailed in the confirmation of rights by Rasko Management and Development Ltd (hereinafter: "the Property"). The Receiver will manage, sell and realize the property according to the Registrar's instructions as follows.

4. At the time the appointment order is issued, the Receiver's personal guarantee will come into effect, without limitation in amount, to cover any damage that is the receiver's responsibility according to any law, obligations and guarantees to the third party, including the creditor and the receiver will be deposited. The debt in the file will serve as an additional guarantee for the actions of the Receiver.

5. The Receiver shall serve a copy of this decision, by personal delivery, to the Debtors and all other owners of rights in the Property (including: registered owner, housing company, contractor, etc.), within 14 days from the date of the appointment, and allow them to submit their objection within 14 days of receiving the order. Additionally, the Receiver shall seek to



**מדינת ישראל – רשות האכיפה והגבייה**



הוצאה לפועל, לשכת ירושלים
תיק 18-03-529055
משכון מקרקעין אחר

בפני כב' הרשם אסף אבני

בקשה מספר: 5 מתאריך 18 מרץ 2019
סוג הבקשה: 988 בקשה כללית

המבקש: זוכה 1, בנק ירושלים בע"מ
בעניין: חייב 1, נימה נינה פישמן דרכון 211450226

תיאור הבקשה: בקשה למתן החלטה

## החלטה



מנימוקי בקשת ב"כ הזוכה ובהיעדר פרעון חוב הפיגורים בהלוואה כפי שסוכם עם מר פישמן אהרון – מיופה כוחה של החייבת בארץ, מורה על מתן צו מינוי כונס נכסים והוראות לכונס/ת הנכסים (כפי סעיפים 3א(ב), ו 53 ו- 54 לחוק ההוצאה לפועל, התשכ"ז – 1967 (להלן: "החוק"))



1. הואיל והחייבים כהגדרתם להלן, לא פרעו את חובם חרף האזהרה שקיבלו, ניתן בזה צו למימוש משכון/משכנתא.

2. לצורך כך אני ממנה בזה את עו"ד עמנואל צנטלר ת.ז. 50496520 ככונס נכסים על זכויות החייבת נימה נינה פישמן דרכון ארה"ב 211450225 (להלן: "החייבים") בנכס הידוע כגוש 30028 חלקה 139 (בעבר חלק מחלקה 70 ספר 1015 דפים 1054 ו- 2284) מגרש 1 עד 6 לפי תוכנית 4715 ירושלים כמפורט באישור הזכויות של חברת רסקו ניהול ופיתוח בע"מ (להלן: "הנכס"). הכונס/ת י/תנהל, י/תמכור וי/תממש את הנכס לפי הוראות הרשם שלהלן.

3. במועד מתן צו המינוי, ייכנס לתוקפו כתב ההתחייבות האישית של כונס הנכסים, ללא הגבלה בסכום, לכיסוי כל נזק שבאחריות כונס הנכסים לפי כל דין. התחייבותו וערבותו צד ג" ולרבות הזוכה והכונס/ת הופקדו. החוב בתיק ישמש ערובה נוספת לפעולות הכונס/ת.

4. על הכונס למסור העתק החלטה זו, במסירה אישית, לחייבים ולכל יתר בעלי הזכויות בנכס (לרבות: בעלים רשום, חברה משכנת, קבלן, וכיו"ב), בתוך 14 ימים ממועד המינוי, ולאפשר להם להגיש לחנגיש הסתייגותם בתוך 14 יום מעת קבלת הצו. כן על הכונס/ת לדאוג





**מדינת ישראל – רשות האכיפה והגבייה**

לרישום צו המינוי אצל כל גורם המנהל רישום זכויות במקרקעין, לרבות אך לא רק: רשם המקרקעין, חברה משכנת, מנהל מקרקעי ישראל, או כל מרשם אחר המתנהל לפי כל דין.

5. הליכי ביצוע המשכנתא, במקרה של דירה המשמשת למגורים, יעוכבו כנגד ביצוע תשלומים כאמור בסעיף 81ב1 לחוק ובכפוף להוראות כל דין.

6. על הכונס להביא לידיעת החייבים בתוך 14 ימים ממתן צו הכינוס כי על פי הוראות סעיף 81ב1 (ב)(4) לחוק, בכל עת עד 90 ימים מיום מינוי הכונס ניתן לפרוע את החוב שבפיגור, לרבות התוספות כהגדרתן בחוק או לפרוע את מחצית החוב שבפיגור והתוספות ובלבד שהתובטח להנחת דעתו של רשם ההוצאה לפועל כי בתוך שישה חודשים מיום התשלום, תשולם יתרת החוב שבפיגור והתוספות, כערכן ביום התשלום בפועל.

7. על הכונס חלה חובת דיווח עדכני ושוטף על כל תקבול שקיבל על חשבון החוב כתוצאה מהליך פתיחת התיק, ו/או כינוס הנכסים, ו/או הסדר תשלומים, לשם ניהול ורישום דף חשבון עדכני בתיק. דיווח כאמור יימסר תוך המועד הקבוע בסעיף 19א" לחוק.

8. ככל שמוגש שטר משכנתא שנחתם לאחר יום 16.5.09 יחולו הוראות סעיף 38 (ג)(2) לחוק בנוגע לדיור חלוף ויקבע דיון במעמד הצדדים.

9. כונס הנכסים יגיש דו"ח ראשון לתיק בתוך 60 יום מהיום ואחת ל-120 יום יגיש דוחות תקופתיים וימציא לחייבים העתק של כל בקשה ודו"ח שיוגש.

10. תשומת לב כונס הנכסים כי במידה ולא יוגשו דו"חות במועד או לא יקוימו החלטות רשם ההוצאה לפועל יתכן וכונס הנכסים יזומן לבירור ו/או יחויב בהוצאות ותישקל אפשרות שחרורו מתפקידו.

11. ככל שזכויות החייב במקרקעין טרם נרשמו על שמו, עובר להגשת בקשה להוצאת הודעת פינוי לחייב, על הכונס/ת לברר בידי מי זה האישורים הדרושים לשם שכלול זכויות החייב, מה נדרש לשם כך [אישורי מסים וכל כיו"ב] וי/תחזור לקבל התחייבות בא כוח מי שמכר את הנכס לחייב, האותו במסמכים, לשת/ף לשם שכלול זכויות החייבים לאחר מכירתן. לבקשה לחתימה על הודעת פינוי יצרף הכונס אישור מסירה המעיד על מסירת החלטה זו לידי החייבים במסירה אישית, ומתן השהות הנדרשת כאמור לעיל, ויפנה להוראות בשטר המשכנתא או בהסכם התחלואה בהם מוותרים החייבים על ההגנות המוקנות להם לפי כל דין. כמו כן, יציג אסמכתא לרישום צו המינוי כאמור לעיל.

12. הליכי הפינוי יבוצעו על ידי אדם הנמנה על האמור בסעיף 5(ב) לחוק. אם יבחר כונס



**מדינת ישראל -- רשות האכיפה והגבייה**

הנכסים לבצע פעולה המוטלת עליו באמצעות בעל תפקיד (שיאושר על ידי רשם ההוצאה
לפועל, מראש) הרי שלא יהא בכך משום שחרור של כונס הנכסים מאחריות לביצוע הפעולה
בהתאם לדין. טרם ביצוע הליך של פינוי המקרקעין יבדוק כונס הנכסים במרכז המידע האם
קיים עיכוב הליכים כללי או של הליך הפינוי.

13. ככל שמדובר בזוכה שהנו בנק או חברת ביטוח, אזי כתב התחייבות הזוכה, בהתאם
לנוסח המצוי בלשכה, יומצא לרשם עם הגשת הבקשה לאישור המכר ויכנס לתוקפו מיד עם
העברת הכספים לזוכה.

14. הכונס ינהג בביצוע פעולות המימוש, המכירה וחלוקת הכספים על פי הוראות שיקבל
מרשם ההוצאה לפועל, לפני ביצוע כל פעולה.

15. כל הכספים שיתקבלו כתוצאה מהליך פתיחת התיק, ו/או כינוס הנכסים ו/או מכר
הנכס, לרבות בשלב ההתמחרות (להלן: הכספים), יוחזקו בידי כונס הנכסים, בחשבון מיוחד
שייפתח אצל הזוכה או אצל תאגיד בנקאי מסחרי שהזוכה נמצא בשליטתו (להלן: חשבון
הכונס). על כונס הנכסים החובה להעביר הכספים מחשבון הכונס לזכות חשבון החייבים
אצל הזוכה, עד לגובה החוב, בהתאם לספריו של הזוכה עם קבלת כספים אלה לידיו.   כל
זאת, באין הוראה אחרת מאת רשם ההוצאה לפועל.

16. יש להודיע לחייבים על ההצעה הגבוהה ביותר, ולאפשר להם להשתתף בהתמחרות.
הוברר לכונס הנכסים כי הנכס, שניתן עליו צו כינוס נכסים, ממושכן במשכון ו/או במשכנתא
(להלן: השעבוד) - לא יימשכו הליכי המכירה עד שתומצא לכל בעלי השעבודים הודעה בדבר
ביצוע הליכי המכירה. בעלי השעבודים זכאים לפנות אל ראש ההוצאה לפועל ולטעון (לפי
החלטתו) בכתב או בעל פה, לעניין מימוש הנכס. למען הסר ספק. נושים מובטחים נוספים
יוזמנו להתמחרות. יש להחתים את הנוכחים בהתמחרות על פרטיכל שיונגש לתיק ובו תיעוד
של הליך ההתמחרות, הנוכחים בו, מהלכו, פירוט ההצעות, וההצעה הזוכה.   לא תאושר
התמחרות טלפונית אלא במקרים חריגים ולפי עתירה מנומקת מראש ורק לאחר קבלת
אישור רשם ההוצאה לפועל לפעול לכך.

17. כונס הנכסים יפרסם מודעה בעיתון יומי נפוץ, ומכירה באמצעות שירותי תיווך תהיה
באישור הרשם מראש. יצוין כי הצעות יש להגיש בתוך 15 ימים מיום פרסום המודעה וכי
ההתמחרות תבוצע עד 45 יום מיום פרסום המודעה. להצעה יצורפו המציעים שיק לפקודת
כונס הנכסים בסך של 10% מסכום ההצעה.

18. כונס הנכסים יודיע לרוכשי הנכס בכתב ועם החתימה על הסכם הרכישה, כי תמורת
המכר תוחזק בידי כונס הנכסים בחשבון כונס, בכפוף לכל הוראה אחרת מאת הרשם.









19. כונס הנכסים לא יקבל לידיו כל תשלום מרוכשי הנכס אלא אם ניתנה החלטת רשם ההוצאה לפועל מראש. כונס הנכסים יהא רשאי לקבלת החזר הכינוס אך זאת לאחר שיגיש בקשה לעניין זה בצירוף קבלות.

20. בכל מקרה של סתירה בין הוראות צו המינוי ו/או החלטת רשם ו/או הוראות החוק לבין הנוהל יגברו צו המינוי ו/או ההחלטה ו/או הוראות החוק על הנוהל.

21. לא יאושרו דמי תיווך למעט מקרים בהם אושרה מראש פנייה לשירותי תיווך. לא יאושרו הוצאות חריגות (כגון: שיפוץ, שמירה, וכו"י) אלא אם עתר/ה הכונס/ת מראש וקיבל/ה אישור רשם ההוצאה לפועל. שמאות תוגש עפ"יי חתקנים המאושרים ובליווי תחשיב.

22. במידה והנכס יימכר חלה על כונס הנכסים החובה להעביר את הזכויות על שם הקונה ולהציג נסח רישום מקרקעין או אישור זכויות המלמד כי הזכויות אכן נרשמו על שם הקונה. לא ניתן להעביר את האחריות לרישום הזכויות לכתפי בא כוח הקונה, אלא אם הוסכם בין הצדדים בהסכם המכר אחרת, במפורש.

23. שכ"יט כונס הנכסים ייפסק בהתאם למחיר המכירה ולתקנות ויבוא במקום שכה"יט הפסוק בתיק.

24. (א) ככל שהתיק נפתח בגין חוב הפיגורים בלבד, עובר להגשת בקשה לאישור מכר על הזכות לבצע את הגדלת קרן החוב בתיק. רק לאחר אישור הגדלת הקרן ותשלום האגרה כמתחייב, יעתור הכונס לאישור המכר; סכום האגרה יחושב על פי ההפרש שבין מלוא חוב ההלוואה שלהבטחתו פירעונם נרשמה המשכנתא, כפי שפורט בבקשה לביצוע, לבין סכום החוב שבפיגור, בתוספת הפרשי הצמדה על ההפרש כאמור; הפרשי ההצמדה יחושבו לפי שיעור שינוי המדד מן המדד שפורסם לאחרונה לפי יום הגשת הבקשה לביצוע או המדד שפורסם לאחרונה לפי יום תשלום יתרת האגרה., (ב) על אף האמור לעיל, עוכב הליכי ביצוע המשכנתא לפי סעיף 1a81(ב)(4) לחוק, יידחה מועד פירעון יתרת האגרה האמור בפסקה (א), עד ביטול עיכוב ההליכים; במועד זה יגיש הזוכה דו"ח לגבי גובה חוב המשכנתא והאגרה תחושב כנגזרת של גובה החוב לפי הדו"יח, בניכוי האגרה ששולמה. (ג) על אף האמור לעיל, ביקש הזוכה במהלך תקופת עיכוב ההליכים את סגירתו של התיק, לא יחויב בתשלום יתרת האגרה. (ד) כונס הנכסים יודע כי הוראות סעיף זה קוימו.

25. הכונס/ת /תעותר /לשחרורה מתפקידו/ה רק לאחר אישור דו"ח סופי ודוח חלוקה. בסיום תפקידו, ולאחר ביטול המינוי, על כונס הנכסים לדאוג למחיקת רישום צו המינוי אצל רשם





המקרקעין או בכל מרשם אחר המתנהל לפי כל דין. כונס הנכסים יציג אסמכתא על מחיקת הרישום.

26. הוברר לכונס הנכסים כי בעקבות ביצוע הליכי המכירה עלולה להיפגע זכותו של צד שלישי, עליו להגיש בקשה למתן הוראות לרשם ולהמציא לצד שלישי העתק הבקשה. הצד השלישי רשאי להגיב (לפי החלטת הרשם) בכתב או בע"פ.

27. בכפוף לכל דין, העברת התמורה לזוכה תבוצע רק לאחר ניכוי הוצאות תשלומי המיסים שהכנס חייב בהם לפי כל דין ו/וסילוק שעבודים או עיקולים הרובצים על הנכס ובגבולות החוב הפסוק. העברת כספים לזוכה תעבור להשלמת התמורה החוזית ממכירת הנכס ו/או השלמת העסקה, תבוצע אך ורק כנגד קבלת כתבי שיפוי מהזוכה ע"ש ולטובת הכונס/ת והחוב בתיק. עותק כתב השיפוי יוגש לתיק.

28. לדוחות כספיים יצורפו אסמכתאות לרבות פרטי חן נאמנות שפתח/ה הכונס/ת לתיק זה, תקבולים מהרוכש, תשלומי הוצאות והעברות לזוכה.

29. חובת הקטנת קרן חלה מהדין; כל תקבולים שיכנסו מהחייב בין בהסדר ובין אם לאו, ותקבולים מהרוכש, יש לבצע הקטנת קרן בגינם, במועד החוקי הקבוע לכך.

30. על הכונס/ת חובה לראות להשלמת העברת זכויות בנכס ע"ש הרוכש, למעט אם יוצג אישור הרוכש בכתב כי הוא פוטר את הכונס/ת מאחריות להעברת זכויות בנכס על שמו ואישורו כי קיבל מהכונס/ת את כל המסמכים שהתחייב/ה הכונס/ת בהסכם המכר להמציאם לידיו.



31. ככל שיושג הסדר חוב בין הזוכה לחייבים, לאחר המינוי, אשר במסגרתו יעתור כונס הנכסים לשחרורו מתפקידו ולסגירת תיק ההוצאה לפועל, אזי, חלה חובה על כונס הנכסים לציין בהסכם כי הוא כפוף לאישור רשם ההוצאה לפועל ולהביא את דבר חתימתו לאישור הרשם בהקדם האפשרי, וכן, בכל במקרה, ליידע את הרשם אודות נושים אחרים של החייב/ת אשר פנו אל כונס הנכסים בנוגע להליך ו/או למימוש הנכס, ממועד המינוי. על כל פנים, במקרה שכזה, סגירת תיק ההוצאה לפועל נתונה לשיקול דעת רשם ההוצאה לפועל.





| תאריך | אסף אבני, רשם |
|---|---|



**EXHIBIT 4**

[*TRANSLATION FROM THE HEBREW*]

**The State of Israel** - **The Enforcement and Collection System Authority**

**Execution Office, Jerusalem**
**File 529055-03-18**
**Real Estate Mortgage Other**
**Hon. Registrar Ariel Lange**

**Motion No.: 63**
**Motion Type: 304 Submission of Report by Receiver**

**The Applicant: Receiver, Adv. Emmanuel Zentler**
**In the Matter of: Debtor 2, Aaron David Fischman Passport 1122591694**

## Decision

Before me is the Receiver's update, according to which he will continue the realization procedures for the benefit of all the debtor's known creditors at this time, in view of the application of a third party to realize the property as part of the receivership procedure.

The eviction notice was approved as part of my decision of January 29, 2023.

In circumstances where the Receiver will act to sell the property and his fees will be updated later in accordance with the execution regulations, relatively to the proceeds that will be received from the realization, I do not find it justified to increase the fees awarded at this stage (as held in the decision dated 11.1.23).

In the absence of another decision, an update report regarding the execution of the eviction and the continuation of the proceedings in this file case will be submitted by 30.3.23.

February 6, 2023

_____          _____
Date                                      Ariel Lange, Registrar

**הוצאה לפועל, לשכת ירושלים**
**תיק:** 18-03-529055
**משכון מקרקעין אחר**
**בפני כב' הרשם אריאל לנגה**

**בקשה מספר:** 63
**סוג הבקשה:** 304 הגשת דוח כונס נכסים

**המבקש:** כונס הנכסים, עו"ד עמנואל צנטלר
**בעניין:** חייב 2, אהרן דוד פישמן דרכון 1122591694

## החלטה

לפניי עדכון כונס הנכסים, לפיו הוא ימשיך בהליכי המימוש לטובת כלל נושי החייב הידועים לעת הזו, נוכח פנייתו של צד ג' למימוש הנכס במסגרת הליך כינוס נכסים.
הודעת הפינוי אושרה במסגרת החלטתי מיום 29.1.23.

בנסיבות בהן הכונס יפעל למכירת הנכס ושכר טרחתו יעודכן בהמשך בהתאם לתקנות ההוצאה לפועל, ביחס לתמורה שתתקבל מהמימוש, אינני מוצא לנכון להגדיל שכר הטרחה שנפסק בשלב זה (כנקבע בהחלטה מיום 11.1.23).

בהיעדר החלטה אחרת, דו"ח עדכון בדבר ביצוע הפינוי והמשך ההליכים בתיק יוגש עד לתאריך 30.3.23.

ט"ו שבט תשפ"ג
06 פברואר 2023

_____      _____
אריאל לנגה, רשם                 תאריך

**EXHIBIT 5**

**Execution Bureau Jerusalem**                                              **529055-03-18**

**In the Matter Between:**     **Bank of Jerusalem Ltd. 52-002563-6**
By Adv. E. Zentler and/or I. Goldsmidt
And/or R. Shviro and/or L. Azran
Of Sharei Israel 15 Jerusalem
Tel: 02-6311003 Fax: 02-6311025

**The Creditor**

**-Vs.-**

**Fischman Aaron David Passport 1122591694**
By Adv. Avraham Barzel
Of King George 59 Jerusalem
Tel: 02-6255060 Fax: 02-6255090

**The Debtor**

# Notification of Update and Motion for the Provision of Decision

## Motion for the Provision of Decision

In accordance with the Honorable Registrar's decision of May 21, 2023 (Motion 85), and after the Debtor's attorney was given an extension to submit his response until June 8, 2023, and since he did not do so and the deadline has passed, the Honorable Registrar is requested to approve the attorney's fees as detailed in the motion, as well as instruct the bureau's secretariat to increase the fee fund in the case accordingly.

## Notification of Update

The appeal that was submitted by the Debtor and his wife to the Supreme Court in case number 858/23, was rejected.

Attached is the judgment dated June 1, 2023.

Pursuant to Regulation 100 of the Civil Procedure Regulations, the stay granted at the time by the Supreme Court is canceled and therefore the proceedings in this case must be reactivated.

For the sake of good order, even though Mrs. Fischman submitted a leave to appeal to the Magistrate's Court on various decisions given in the enforcement file, a stay was not requested there, and therefore there is no impediment to continue the foreclosure procedures.

_____

Emmanuel Zentler, Adv.

Receiver

בעניין שבין :   **בנק ירושלים בע"מ 52-002563-6**
ע"י עוה"ד ע. צנטלר ו/או י. גולדשמידט
ו/או ר. שבירו ו/או ל. עזרן
מרחוב שרי ישראל 15 ירושלים
טל : 6311003-02 פקס : 6311025-02

הזוכה

- נ ג ד -

**פישמן אהרון דוד דרכון 1122591694**
ע"י ב"כ עוה"ד אברהם ברזל
מרח' המלך ג'ורג' 59, ירושלים
טל : 6255060-02 פקס : 6255090-02

החייב

# הודעת עדכון ובקשה למתן החלטה

### בקשה למתן החלטה :

בהתאם להחלטת כב' הרשם מיום 21.5.23 (בקשה 85), ולאחר שניתנה לב"כ החייב ארכה
להגשת תגובתו עד ליום 8.6.2023 ומשלא עשה זו וחלף המועד, מבוקש מכב' הרשם לאשר
שכר טרחתו של החי"מ כמפורט בבקשה וכן להורות למזכירות הלשכה להגדיל את קרן
שכר הטרחה בתיק בהתאם.

### הודעת עדכון :

הערעור שהוגש ע"י החייב ורעייתו לבית המשפט העליון בנסגרת תיק מס' 858/23, נדחה.
מצ"ב פסק הדין מיום 1.6.2023.
מכח תקנה 100 לתקנות הסד"ח עיכוב הביצוע שניתן בשעתו ע"י בית המשפט העליון
מתבטל ולכן יש לשפעל את ההליכים בתיק.
למען הסדר הטוב, הגם שהגב' פישמן הגישה בר"ע לבית משפט השלום על החלטות שונות
שניתנו בתיק ההוצל"פ לא התבקש שם עיכוב הליכים ולכן אין מניעה להמשיך בהליכי
המימוש.

עמנואל צנטלר, עו"ד
כונס נכסים

שם תיק בנק FISCHMAN AARON AND NINA-030-300052149
54030/44/290שוחפ'נו

- 1 -

**EXHIBIT 6**

**The State of Israel - The Enforcement and Collection System Authority
In front of Hon. Registrar Ariel Lange**

File 529055-03-18 (Real Estate Mortgage Other)

**Motion No.: 90 dated 15 August 2023
Motion Type: 988 General Motion**

**The Applicant: Receiver 1, Adv. Emmanuel Zentler
In the Matter of: Creditor 1, Bank of Jerusalem Ltd. Company / Partnership 520025636**

Details of Preceding Procedure: Creditor's Response to Urgent Motion by Debtor No. 90

**<u>Decision</u>**

Before me is the response of the Creditor's attorney - the Receiver to the motion of the Debtor's wife to delay the approval procedure of the sale of the property that is in receivership.

The Receiver stated that the right of a third party, which is no longer a party to this proceeding, is very limited and that the Registrar does not have the authority determine her rights in the property, but only to suspend the procedure in order to allow her to turn to the competent courts.

According to the Receiver, the Debtor's wife and her attorney will do everything in their power to delay the examination of their claims and therefore, they did not attach the full documents to their motion, and his requests to the Debtor's wife's attorney for their production even prior to turning to this instance, were unanswered and the full documents were not presented to him.

Notably, in my decision of August 9, 2023, I allowed the Debtor's wife to produce the documents until September 6, 2023, and this deadline has not yet passed.

However, the Receiver is right that even if it is determined that the debtor's wife has rights to the property by virtue of balancing resources between spouses and the Property Relations between Spouses Law, it is a matter of partial rights in the property, and this does not prevent approval to sell the property, taking into account the realization procedures that have been taking place in this case for some time, and as the Debtor's wife's claim
before the honorable rabbinic court will be accepted, her rights are subject to the lien registered in favor of the Creditor in this file, and her share of the property will be decided, as part of the distribution of the proceeds of the sale of the property.

The Receiver argued against the timing of the filing of the lawsuit, and this matter was even noted in the Rabbanical Court's decision dated August 1, 2023 (...**"this request was observed only after the bidding date, so the time for the requested relief has passed"**).

The Receiver proved to me that the Debtor's attorney, who also represents the Debtor's wife, was summoned to the bidding process, but chose not to attend the bidding meeting.

The Debtor's attorney who received the request for approval of the sale of the property and receives the decisions in this file through email, text message and personal confirmation, did not submit a response to the file as instructed in my decision dated 6.8.23.

Therefore, in the absence of an injunction from a competent court, I grant the motion for approval of sale of the property and instruct as follows:

1. On the basis of the motion and its appendices, I approve the sale of the property in receivership to Daniel Marisa Beer US passport 586247509 (hereinafter: **"the Buyer"**), in exchange for a total of 14,500,000 NIS. This approval is subject to verification of the Debtor's identity as the owner of the real estate property, and the Buyer's rights to the purchase real estate property in Israel.

2. If necessary, the Receiver will submit a motion to increase the debt in the file for the full amount of the debt of the loan to be paid, while paying the fee differences.

3. In accordance with the provision of Section 54 (d) of the **Execution Law 5777 - 1967** (hereinafter: "the Law"), the proceeds of the sale will be deposited by the Buyer, directly into the execution file, with a check to the order of the execution treasurer, and will be delayed until the decision regarding their distribution, at the request of a receiver/creditor, and against the presentation of a certain and up-to-date written indemnity by the Creditor. **I am ordering the withholding of funds in the file until otherwise decided**.

4. A formal order for the transfer of rights will be signed after receiving full consideration and submission of a report.

5. The Receiver will not finish his job before he verifies that the ownership is registered in the Buyer's name.

6. An order is hereby issued instructing the Land Registrar to register a cautionary note on the Debtor's rights in the property, for the benefit of the Buyer and for the benefit of the bank that will finance the purchase for them. The receiver is obliged to produce a reference regarding the registration of the cautionary note in favor of the Buyer within 7 days from the date of full payment of the sale proceeds, otherwise the foreclosure procedures in this file will be delayed.

7. I authorize the Receiver to sign a letter of commitment to register a mortgage so that the Buyer is able to take out a loan secured by mortgage, if necessary. This decision is not to confirm the content of the sales agreement and the documents signed by the Receiver, and it does not replace the Receiver's professional judgment regarding the contractual liability derived from these documents.

8. The Receiver's fees and the receivership's expenses will be decided after the completion of the transfer of the sale proceeds to the file, based on a receiver report of his actions and expenses, accompanied by an affidavit, references and accounting for each component.

9. The Receiver will submit a financial report after full consideration is deposited in the file, and will clarify in the attachment of reference to whether there are rights to a certain the third party, and if

so, what is its status regarding the distribution of proceeds, when the distribution proceeds among the unsecured creditors, will be approved and carried out only after completing the transfer of rights in the property to the Buyer's name.

10. It is possible to petition for the performance of certain mandatory payments and collection expenses at the same time as the first payment is deposited according to the procedural regulations. It is clarified that the municipality tax debt will be recognized as a collection expense in priority by law, for the period of seizure of possession by the Receiver of the property only.

11. The Receiver may sign on behalf of the Debtor documents as detailed above and report the transaction, while the request to use the exemption from appreciation tax will be signed by the Debtor.

12. This decision of mine will enter into force on September 6, 2023, in the absence of a temporary injunction order.

27 August, 2023

| | |
|---|---|
| _____ | _____ |
| Date | Ariel Lange, Registrar |


תיק 529055-03-18 (משכון מקרקעין אחר)

**בקשה מספר** : <u>90</u> **מתאריך** 15 אוגוסט 2023
**סוג הבקשה** : 988 בקשה כללית

**המבקש** : כונס נכסים 1, עמנואל צנטלר
**בעניין** : זוכה 1, בנק ירושלים בע"מ חברה/שותפות 520025636

פרטי הליך מקדים : תגובת הזוכה לבקשה בהולה של החייב בבקשה מס' 90

# <u>החלטה</u>

לפניי תגובת ב"כ הזוכה- כונס הנכסים לבקשת אשת החייב לעיכוב הליך אישור מכר הנכס שבכינוס.

הכונס ציין כי זכותה של צד ג', אשר איננה עוד צד להליך זה, מוגבלת מאוד וכי אין בסמכות רשם ההוצאה לפעול להכריע בזכויותיה בנכס, אלא רק כדי להשהות הליך על מנת לאפשר לה לפנות לערכאות המוסמכות.

לטענת הכונס, אשת החייב ובא- כוחה יעשו כל אשר לאל ידם לעכב בירור טענותיהם ועל כן, לא צירפו לבקשתם את מלוא המסמכים, ופניותיי לב"כ אשת החייב להמצאתם עוד טרם מתן החלטת מותב זה, לא נענו, ולא הומצאו לו המסמכים המלאים.

יוער, בהחלטתי מיום 9.8.23 איפשרתי לאשת החייב להמציא המסמכים עד לתאריך 6.9.23, ומועד זה טרם חלף.

עם זאת, צודק הכונס כי אף אם ייקבע כי לאשת החייב זכויות בנכס מכוח איזון משאבים בין בני זוג וחוק יחסי ממון, מדובר בחלקיות מהזכויות בנכס, ואין בכך כדי למנוע את אישור מכר הנכס, בשים לב להליכי המימוש שמתקיימים בתיק זה זמן מה, וככל שתביעת אשת החייב בפני בית הדין הרבני הנכבד תתקבל, זכויותיה כפופות לשעבוד הרשום לטובת הזוכה בתיק דנא, וחלקה בנכס יוכרע, במסגרת חלוקת תמורת מכר הנכס.

הכונס טען כנגד העיתוי של מועד הגשת התביעה, ועניין זה אף צויין בהחלטת בית הדין הרבני מתאריך 1.8.23 (..."**בקשה זו נצפתה רק לאחר מועד ההתמחרות, כך שעבר זמן הסעד המבוקש**").

הכונס הוכיח בפניי כי ב"כ החייב אשר מייצג אף את אשת החייב, זומן להליך ההתמחרות, אך בחר שלא להגיע לישיבת ההתמחרות.



ב"כ החייב אשר קיבל לידיו את הבקשה לאישור מכר הנכס ומקבל את ההחלטות בתיק באמצעות דוא"ל, מסרון ואישור אישי, לא הגיש תגובה לתיק כנקבע בהחלטתי מיום 6.8.23.

אשר על כן, בהיעדר צו מניעה מטעם הערכאה המוסמכת, אני נעתר לבקשה לאישור מכר הנכס ומורה כדלקמן:

1. על יסוד הבקשה, על צרופותיה אני מאשר את המכר של הנכס שבכינוס לדניאל מריסה ביר דרכון ארה"ב 586247509 (להלן: "**הקונה**"), בתמורה לסך של 14,500,000 ש"ח. אישור זה כפוף לאימות זהות החייב כבעל הזכויות במקרקעין, וזכויות הקונה לרכוש מקרקעין בישראל.

2. במידת הצורך, יעתור כונס הנכסים להגדלת החוב בתיק על סך מלוא חוב ההלוואה לפירעון, אגב תשלום הפרשי אגרה.

3. בהתאם להוראות סעיף 54(ד) **לחוק ההוצאה לפועל תשכ"ז**-1967 (להלן: "**החוק**"), כספי תמורת המכר יופקדו ע"י הקונה, ישירות לתיק ההוצאה לפועל, בהמחאה לפקודת גזברות ההוצאה לפועל, ויעוכבו עד להחלטה בדבר חלוקתם, על פי בקשת כונס/זוכה, וכנגד הצגת כתב שיפוי מסוים ועדכני מאת הזוכה. **הנני מורה על עיכוב כספים בתיק עד להחלטה אחרת**.

4. צו פורמלי להעברת הזכויות ייחתם לאחר קבלת מלוא התמורה והגשת הדו"ח.

5. כונס הנכסים לא יסיים את תפקידו בטרם יוודא כי הבעלות נרשמה על שם הקונה.

6. ניתן בזאת צו למורה לרשם המקרקעין לרשום הערת אזהרה על זכויות החייב בנכס, לטובת הקונה ולטובת הבנק שיממן להם את הרכישה. כונס הנכסים מחוייב להמציא לתיק אסמכתה בדבר רישום הערת האזהרה לטובת הקונה בתוך 7 ימים מיום השלמת מלוא תמורת מכר הנכס, אחרת יעוכבו הליכי הכינוס בתיק.

7. מאשרת לכונס הנכסים לחתום על כתב התחייבות לרישום משכנתא על מנת שהקונה יוכל ליטול הלוואה מובטחת במשכנתה, במידת הצורך. אין בהחלטה זו כדי לאשר את תוכנם של הסכם המכר והמסמכים עליהם חותם כונס הנכסים, ואין בה כדי להחליף את שיקול דעתו המקצועי של כונס הנכסים ביחס לאחריות החוזית הנגזרת ממסמכים אלה.

8. שכ"ט כונס והוצאות הכינוס יפסקו לאחר השלמת העברת המכר תמורת המכר לתיק, על יסוד דו"ח כונס אשר לפעולותיו והוצאותיו, בצירוף תצהיר, אסמכתאות ותחשיב לכל רכיב.



9. כונס הנכסים יגיש דו"ח כספי לאחר הפקדת מלוא התמורה בתיק, ויבהיר בצירוף אסמכתא האם קיימות זכויות לצד ג' מאן דהוא, ואם כן, מה מעמדו לעניין חלוקת התמורה, כאשר חלוקת הכספים בין הנושים הבלתי מובטחים, תאושר ותתבצע רק לאחר השלמת העברת הזכויות בנכס ע"ש הקונה.

10. ניתן יהא לעתור לביצוע תשלומי חובה והוצאות כינוס מסוימים בד-בבד עם הפקדת התשלום הראשון על פי סדרי הדין. יובהר כבר עתה, כי חוב ארנונה יוכר כהוצאת כינוס בדין קדימה, לתקופת תפיסת החזקה ע"י הכונס בנכס בלבד.

11. כונס הנכסים רשאי לחתום בשם החייב על מסמכים כמפורט לעיל ולדווח על העסקה, כאשר הבקשה לעשות שימוש בפטור ממס שבח תיחתם ע"י החייב.

12. **החלטתי זו תיכנס לתוקף בתאריך** 6.9.23, **בהיעדר צו מניעה ארעי.**

<div dir="rtl">

י' אלול תשפ"ג
27 אוגוסט 2023

</div>

---
אריאל לנגה, רשם          תאריך

**EXHIBIT 7**

**The State of Israel** - **The Enforcement and Collection System Authority**

## In front of Hon. Registrar Ariel Lange

File 529055-03-18 (Real Estate Mortgage Other)

**Motion No.: <u>98</u> dated 18 September 2023**
**Motion Type: 988 General Motion**

**The Applicant: Receiver 1, Adv. Emmanuel Zentler**
**In the Matter of: Debtor 2, Aaron David Fischman Passport 1122591694**

Details of Preceding Procedure: Motion for Sale Order in accordance with Section 34A of the Law

## <u>Decision</u>

Since the sale consideration has been paid in full and deposited in the execution file, the order of sale is signed and transferred to the bureau's secretariat.

A copy of the order will be scanned into the paper file.

I noted that the transaction was reported by the Receiver to the tax authorities, and that he would act to submit a request for a certificate from the municipality.

I instruct the Receiver to present a reference to the file regarding the registration of a cautionary note in favor of the buyer, within 7 days from today, as held in section 6 of my decision of 27.8.23 in procedure 90.3.

19 September, 2023

_____                    _____
                Date                                                Ariel Lange, Registrar



**בפני כב' הרשם אריאל לנגה**

תיק 18-03-529055 (משכון מקרקעין אחר)

**בקשה מספר**: <u>98</u> **מתאריך** 18 ספטמבר 2023
**סוג הבקשה**: 988 בקשה כללית

**המבקש**: כונס נכסים 1, עמנואל צנטלר
**בעניין**: חייב 2, אהרן דוד פישמן דרכון 1122591694

פרטי הליך מקדים: בקשה למתן צו אישור העברה עפ"י סעיף 34א' לחוק

## <u>החלטה</u>

משישולמה מלוא תמורת המכר והופקדה לתיק ההוצאה לפועל, צו המכר נחתם וייועבר למזכירות הלשכה.

העתק מהצו ייסרק לתיק נייר.

רשמתי, כי העסקה דווחה על ידי הכונס לרשויות המס, וכי הוא יפעל להגשת בקשה למתן תעודה מטעם העירייה.

**מורה לכונס הנכסים להציג אסמכתה לתיק בדבר רישום הערת אזהרה לטובת הקונה, בתוך 7 ימים מהיום, כנקבע בסעיף 6 להחלטתי מיום 27.8.23 בהליך 90.3.**

|  |  |
|---|---|
| | **ד' תשרי תשפ"ד** |
| | 19 ספטמבר 2023 |

_(חתימה)_ גי  אל

_____ _____
אריאל לנגה, רשם                                תאריך

**EXHIBIT 8**

**Execution Bureau Jerusalem**                                    529055-03-18

In the Matter Between:        **Bank of Jerusalem Ltd. 52-002563-6**
                             By Adv. E. Zentler and/or I. Goldsmidt
                             And/or R. Shviro and/or L. Azran
                             Of Sharei Israel st. 15 Jerusalem
                             Tel: 02-6311003 Fax: 02-6311025
                                                              **The Creditor**

                                    -Vs.-

                             **Fischman Aaron David Passport 1122591694**
                             By Adv. Avraham Barzel
                             Of King George st. 59 Jerusalem
                             Tel: 02-6255060 Fax: 02-6255090

                                                              **The Debtor**

And in the Matter of:        **Emmanuel Zentler, Adv. Receiver on the Debtor's rights**
                             By Adv. I. Goldsmidt and/or R. Shviro
                             and/or L. Azran
                             Of Sharei Israel st. 15 Jerusalem
                             Tel: 02-6311003 Fax: 02-6311025
                                                              **The Receiver**

And in the Matter of:        **Land Registration Bureau in Jerusalem**

And in the Matter of:        **Housing Company Rasko Management and Development Ltd.**

# <u>Order for the Approval of Transfer Pursuant to Section 34A of the Sale Law</u>

A.  In the scope of this file, the sale of the Debtor's rights was approved by the Honorable Execution Registrar, in relation to real estate known as Block 30028 Parcel 139 situated in George Washington St. 16/4 ("Sold Property") to **Mr. Daniel Marissa Beer US Passport 586247509** (hereinafter: "the Purchaser") for the consideration of ILS 14,500,000.

B.  Whereas the consideration has been fully paid, I hereby grant an order pursuant to Section 34A of the Sale Law, 5728-1968 and to regulation 69 of the Execution Regulations 1979 and instruct the Land Registration Bureau in Jerusalem and the Housing Company Rasko Management and Development Ltd. to register the Sold Property in the name of the Purchaser free of any

encumbrance, lien or any third party right whether imposed before the issuance of this order or after, without prejudice to the generality of the above, including the comments as follows:

**<u>According to the registry</u>**

1. Attachment order based on deed No. 28310/2018/1 dated 11.10.2018.

2. Commitment to register a mortgage dated 6.4.2008 in favor of Bank of Jerusalem Ltd. in the first degree in the sum of $1,425,000.

3. Attachment order of the District Court of Jerusalem in court case 23366-09-18 dated 13.9.2018.

4. Attachment order of the Execution Bureau of Jerusalem in case No. 531797-07-20 dated 24.10.2021.

5. Ruling dated 27.10.2022 and complementary ruling dated 12.1.2023.

To the exclusion of any right that is not used as a financial guarantee, and a right that is not terminated according to the terms of sale.


Granted Today  <u>19.09.23</u>

Execution Bureau in Jerusalem                                            -Ariel Lange-

                                                                        Execution Registrar

                                                            _____

| בעניין שבין: | בנק ירושלים בע"מ 6-002563-52 |
|---|---|

ע"י עוה"ד ע. צנטלר ו/או י. גולדשמידט
ו/או ר. שבירו ו/או ל. עזרן
מרחוב שרי ישראל 15 ירושלים
טל: 02-6311003 פקס: 02-6311025

**הזוכה**

- נ ג ד -

**פישמן אהרון דוד דרכון 1122591694**

ע"י ב"כ עוה"ד אברהם ברזל
מרח' המלך ג'ורג' 59, ירושלים
טל': 02-6255060 פקס: 02-6255090

**החייב**

| ובעניין: | **עמנואל צנטלר, עו"ד, כונס נכסים לזכויות החייב** |
|---|---|

ע"י ב"כ עוה"ד י. גולדשמידט ו/או ר. שבירו
ו/או ל. עזרן
מרחוב שרי ישראל 15, ירושלים
טל: 02-6243020; פקס: 02-6243556

**כונס הנכסים**

| ובעניין: | **לשכת רישום המקרקעין בירושלים** |
|---|---|
| ובעניין: | **החברה המשכנת רסקו ניהול ופיתוח בע"מ** |

## צו אישור העברה עפ"י סעיף 34א' לחוק המכר

א. במסגרת התיק שבכותרת בקשה זו אושרה ע"י כב' רשם ההוצאה לפועל מכירת זכויות החייב, במקרקעין הידועים כגוש 30028 חלקה 139 הנמצא ברח' ושינגטון 4/16, ירושלים (להלן: "הממכר") לה"ה **דניאל מריסה ביר דרכון ארה"ב 586247509** (להלן: "הרוכשת") תמורת סך של 14,500,000 ש.

ב. הואיל והתמורה שולמה במלואה, הנני נותן בזאת צו לפי סעיף 34א' לחוק המכר התשכ"ח- 1968 ולפי תקנה 69 לתקנות ההוצאה לפועל התשל"מ- 1979 ומורה ללשכת רישום המקרקעין בירושלים ולחברה המשכנת רסקו ניהול ופיתוח בע"מ לרשום את הממכר על שמה של הרוכשת כשהוא נקי מכל שיעבוד, עיקול או זכות צד ג' כלשהי בין שהוטלו לפני מתן צו זה ובין לאחריו, מבלי לפגוע בכלליות האמור לעיל לרבות החרות כדלקמן:

**עפ"י נסח רישום:**

1. צו עיקול עפ"י שטר מס' 28310/2018/1 מיום 11.10.2018.

2. התחייבות לרישום משכנתא מיום 6.4.2008 לטובת בנק ירושלים בע"מ בדרגה ראשונה על סך של 1,425,000$.

3. צו עיקול מבימ"ש מחוזי בירושלים תיק בימ"ש 18-09-23366 מיום 13.9.2018.

4. צו עיקול מלשכת ההוצאה לפועל בירושלים תיק מס' 20-07-531797 מיום 24.10.2021.

5. פסיקתא מיום 27.10.2022 ופסיקתא משלימה מיום 12.1.2023.

חוץ מזכות שאינה משמשת ערובה לחיוב כספי, ומזכות שאינה מתבטלת על פי תנאי המכירה.

אריאל לנגה
רשם הוצאה לפועל

ניתן היום _19.09.23_

ההוצאה לפועל בירושלים